**NEWARK MORNING LEDGER CO.,**

v.

**NEWARK TYPOGRAPHICAL UNION LOCAL 103, Appellant.**

**No. 85–5535.**

United States Court of Appeals, Third Circuit.

Argued March 18, 1986.

Decided Aug. 11, 1986.

As Amended Aug. 26, 1986.

Jack Wysoker (argued), Wysoker, Glassner & Weingartner, New Brunswick, N.J., for appellant.

Donald A. Robinson (argued), Robinson, Wayne, Levin, Riccio & La Sala, Newark, N.J., Bruce H. Berry, John G. Zandy, Sabin, Bermant & Blau, New York City, for appellee.

Before HUNTER and MANSMANN, Circuit Judges and POLLAK District Judge *

**OPINION OF THE COURT**

LOUIS H. POLLAK, District Judge.

### I.

The question presented is whether the district court erred in modifying an arbitral award that was intended to resolve a dispute arising under a collective bargaining agreement. The question arises in the following way:

### A.

Appellant is Newark Typographical Union Local 103, collective bargaining representative of the composing room employees of appellee Newark Morning Ledger. The dispute between the parties is over the amount of weekly wage increase (and attendant cost-of-living increase) composing room employees were entitled to in 1984 pursuant to the 1983 collective bargaining agreement between Local 103 and The Ledger.

The 1983 collective bargaining agreement—which amends and extends to 1994 an agreement originally entered into in 1970—undertakes to tie the annual wage increases of The Ledger's composing room employees to those received by comparable employees of daily newspapers in New York City. Section 7–06 of the agreement specifies that:

the increases under this Contract shall be the total value of the weekly increases in wages and cost-of-living adjustments received by the New York Typographical Union No. 6 under its agreement with

the Publishers' Association of New York City.

And Section 7–09 provides:

In the event that the Publishers' Association of New York City is disbanded or ceases to negotiate for more than one daily newspaper in New York City, then the increases under this contract shall be the average increases received by the New York Times, New York News and New York Post, to the extent that there are increases granted to any employees under said contract.

The negotiations conducted by Local 6 of the New York Typographical Union achieved the following results: Composing room employees of The News, The Post and The Times all received a weekly wage increase of $38. In addition, employees of The News and The Post were promised a lump-sum share of profits payable by April 10, 1985; in lieu of profit-sharing, Times' employees received in 1984, on top of the $38 wage increase, a weekly increment of $25.93 (plus $.72 cost-of-living) which was, according to President Powers of Local 6, "a bonus of a 4% wage increase" as "an incentive for an early agreement."

### B.

Against this background, Local 103 advised The Ledger that the proper 1984 weekly wage increase was $46.88: This figure appears to have been the sum of $38 (the wage increase common to all three New York dailies) plus one-third of The Times' "bonus" of $25.93 and one-third of The Times' $.72 cost-of-living increment.

The Ledger took the position that only a $38 increase was called for, since The Times' added $25.93 was " 'in lieu of a profit sharing program negotiated at the News and Post'.... [t]hese monies represent the equivalent of a diversion from a profit sharing plan to wages, and are not 'increases under the contract' received by the New York Times."

* The Honorable Louis H. Pollak, U.S. District Court for the Eastern District of Pennsylvania, sitting by designation.

Local 103 thereupon filed a grievance against The Ledger, and the matter proceeded to arbitration. At the outset of the arbitration, Local 103 announced that it had reconsidered its position: What its members were entitled to (in addition to the $38 to which The Ledger assented) was the entire $25.93 and $.72 in cost-of-living received by The Times' composing room employees.

### C.

En route to fashioning his award, the Arbitrator addressed and decided three predicate issues:

*First,* the Arbitrator denied The Ledger's motion to dismiss the grievance based on Local 103's last-minute change in position: The Ledger had not sought a continuance, and had made no showing of prejudice.

*Second,* the Arbitrator rejected The Ledger's contention that the $25.93 received by The Times employees was not a wage increase but a bonus. "A bonus," wrote the Arbitrator, "is something that is given above what is due. It is a short term giving; it is [a] one shot deal. After it is paid, what was added to reverts to what was originally due." The Post and News employees "received monies above what was due, payable in a lump sum on or before April 10 of the following year after the Plan year. They received a bonus." By contrast:

> New York Times employees received a permanent change in the "Wage Rate and Cost of Living Adjustment provisions of the Contract and Special Agreement." A permanent change in wages and gross pay paid at the end of each pay period. It cannot be reduced or increased without further bargaining. The New York Times employees received a wage increase. They did not received [*sic*] a bonus.

> Why they received this increase is immaterial. It does not matter if it was in lieu of what someone else received. It does not matter if it was for early signing of the contract. What they received was [a] permanent wage increase.

*Third,* the Arbitrator considered whether, as Local 103 contended and The Ledger denied, the Local 6 agreement was negotiated with the Publishers' Association rather than directly with the three New York dailies.[1] The Arbitrator was not persuaded by Local 103's testimony.

The Arbitrator then announced and explained his award. The substance of that exposition follows:

> As the Association was in effect disbanded during the negotiations of the "blue book," "the increase under this contract [Ledger and Local 103] shall be the average increase provided by the New York Times, New York Daily News and the New York Post, to the extent that there are any increases granted any employees under said contract". As all parties, including the Star Ledger, received the $38 increase, and only the New York Times employees received an additional increase the $25.93 plus $.72 Cost of Living adjustment, as compared to a bonus the News and Post employees received, I find that the $25.93 plus Cost of Living Adjustment is appropriate.

> There is nothing in any contract stating that any increases in the New York contract must be in toto. If the Association fails to function, an average of the increases is determined. Mathematically, if all parties negotiating individually, agree on the same increase, the result would be in toto. If News and Post employee [*sic*] received bonuses, which are not increases, and Times employees received permanent increases, the aver-

---

1. It will be recalled (see text, *supra,* at p. 163) that under the Local 103–Ledger contract, Section 7–06 calls for payment to Ledger composing room employees of "the total value of the weekly increases in wages and cost-of-living adjustments received by [Local 6] under its agreement with the Publishers' Association," whereas Section 7–09 provides that if "the Publishers' Association ... is disbanded or ceases to negotiate for more than one daily newspaper in New York City, then the increases under this contract shall be the average increases received by the New York Times, New York News and New York Post ..."

age of the increases can not be determined, but any increases granted to any employees under said contract shall be.

\* \* \* \* \* \*

Accordingly, based upon the above, the undersigned finds that under the parties' collective agreement the employees of the Newark Morning Ledger are entitled to additional money and benefits and direct [*sic*] that they be paid $25.93 plus .72 cost of living adjustment per week effective the date on which the issue was raised. . . .

### D.

After the filing of the arbitral award, The Ledger, invoking the jurisdiction conferred by the Labor Management Relations Act, 29 U.S.C. § 185(a) and the United States Arbitration Act, 9 U.S.C. § 10, brought this proceeding in the District Court for the District of New Jersey to vacate, or, in the alternative, to modify, the award.

The district court concluded that the award, as explained in the arbitrator's opinion, was incompatible with the collective bargaining agreement, and accordingly modified the award to require the weekly wage increase mandated by the agreement. The proper weekly wage increase, as determined by the district court, was $46.88—the amount that had been demanded by Local 103, and refused by The Ledger, prior to the filing of the grievance.

Local 103 has appealed from the decision below.[2]

### II.

In considering the relative roles of labor arbitrator and district judge, we start from the premise, articulated by the district court in this case, "that in order to disturb an arbitrator's award a court must overcome a strong presumption in favor of the award." As this court has stated, "only where there is a manifest disregard of the [collective bargaining] agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969). This strict standard means that a reviewing court will decline to sustain an award "only in the rarest case." R. Gorman, Labor Law 586 (1976). And that is as it should be, for frequent judicial disapproval of the awards of labor arbitrators would tend to undermine a system of private ordering that is of the highest importance to the well-being of employer and worker alike. *See* Shulman, *Reason, Contract, and Law in Labor Relations*, 68 Harv.L.Rev. 999 (1955). But in that "rarest case" of "manifest disregard of the [collective bargaining] agreement," the district judge must draw the line. For "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).[3]

---

**2.** In addition to modifying the award, the district court (1) rejected The Ledger's contention that the Arbitrator should not have proceeded with the arbitration when Local 103 changed its position, and (2) rejected Local 103's contention that the Arbitrator should have directed the payment of interest on the award. Neither of these questions has been presented to this court on appeal.

**3.** The Supreme Court's formulation in 1960, in *Steelworkers*, remains, a generation later, the authoritative exposition of the proper relationship between courts and labor arbitrators. The *Steelworkers* approach was adumbrated in important respects by Professor Summers' pioneering article several years before on *Judicial Review of Labor Arbitration*, 2 Buffalo L.Rev. 1, 21–22, 24 (1952):

Labor arbitration is a part of the process of collective bargaining; a procedure for administering an agreement and adjusting disputes between the parties. The question is the practical one of the role which the courts should

In this case, we conclude that "the arbitrator's words [do] manifest an infidelity to this obligation."

The Arbitrator's difficulty was not apparent at the outset of his analysis. His unimpeachable factual finding that Local 6 negotiated the 1984 increases with the three dailies rather than with the Publishers' Association set the stage for the Arbitrator's observation—mandated by Section 7–09 of the Local 103/Ledger collective bargaining agreement[4]—that "[i]f the Association fails to function, an average of the increases is determined." So far so good. But then the Arbitrator took the verbal step which led him away from the

collective bargaining agreement and into error: "If News and Post employee [*sic*] received bonuses, which are not increases, and Times employees received permanent increases, the average of the increases can not be determined, but any increases granted to any employees under said contract shall be."

To say that "the average of the increases can not be determined," where one of the increases is $25.93, plus $.72 cost-of-living, and the other two are zero, is flawed arithmetic. The average can be determined. The average is $8.64, plus $.24, for a total of $8.88. The sum of $8.88 and $38.00 (the base wage increase granted by all three dailies, and conceded by The Ledger) is

play in that procedure to make it serve more adequately the needs of the parties.

The difficulty of the question springs from the fact that labor arbitration itself rests upon a basic inconsistency. On the one hand both union and management prize their freedom to bargain. They demand the right to make their own agreement, and once made they insist that no one shall change it. The strength of this feeling is evidenced by the infrequency with which the parties will arbitrate the making of an agreement and the nearly unanimous objection of both parties to what is commonly known as compulsory arbitration. Because of this deep-rooted attitude, the parties usually insist that grievance arbitration be confined to "interpretation and application" of the agreement. On the other hand, one of the main reasons for arbitration is the failure of the parties to make a completed agreement. No attempt is made to provide explicitly for every potential dispute. On the contrary, gaps may be intentionally left, ambiguous phrases deliberately used, and minor problems left undiscussed. The agreement is signed with both parties knowing full well that many problems remain to be settled through the grievance procedure and by arbitration if necessary. Thus, arbitration becomes the means for completing the agreement. The parties themselves seldom see clearly the inconsistency of demands which they make on the arbitration process and it is this which the courts must discover.

The courts, in supervising labor arbitration, are faced with the dilemma posed by these conflicting desires of the parties. If the courts do not hold a check rein on arbitrators, the parties may be fearful that their agreement will be remade and therefore hesitate to use the arbitration process. But if the courts hold the reins too tightly, the arbitrator loses flexibility and his usefulness is greatly decreased.

\* \* \* \* \* \*

Most important of all the arbitrator's qualifications is the fact that he is the product of the parties' free choice. The parties by agreeing to arbitration indicate a preference for that method of settling their disputes. They establish it as the administrative process best suited to their needs.

The fact that an arbitrator is an expert aided by a free procedure and vested with power by the consent of the parties does not mean that the courts should exercise no supervisory function. The parties' consent is but a limited one, and they need some assurance of protection from an arbitrator who may run amuck. Furthermore, judicial review has a preventative as well as curative value. Its very presence keeps arbitrators aware that their power is limited and reduces the temptation to play god for the parties. The need is not for judicial abdication, but for judicial restraint. The court should give full recognition to the expertness of the arbitrator and due deference to the choice of the parties, and substitute its judgment for that of the arbitrator only when he was so palpably wrong that to allow his decision to stand would undermine confidence in the arbitration process itself. The test, however, can not be embodied in immutable words, for it is an attitude of tolerance and humility, not a mathematical formula.

4. "In the event that the Publishers' Association of New York City is disbanded or ceases to negotiate for more than one daily newspaper in New York City, then the increases under this contract shall be the average increases received by The New York Times, New York News and New York Post, to the extent that there are increases granted to any employees under said contract."

$46.88,[5] the weekly wage increase determined by the district court to be owing to The Ledger's composing room force.

The Arbitrator's flawed arithmetic evidently reflected a flawed understanding of the charter from which the Arbitrator derived his authority—the collective bargaining agreement. Section 7–06 of that agreement contemplates that The Ledger's composing room employees are to receive "the total value of the weekly increases in wages and cost-of-living adjustments" received by New York composing room employees when the latter are covered by a master contract negotiated, on the newspapers' behalf, by the Publishers' Association. But when joint negotiation via the Publishers' Association gives way to separate contracts with individual newspapers, Section 7–09 contemplates that The Ledger's composing room employees are to receive an increase equivalent to the average of the increases agreed to by the three leading dailies. The Arbitrator found that in the case at bar the bargaining process had been of the latter sort, but he did not follow out the logic of his factual finding to the legal conclusion mandated by the collective bargaining agreement.[6]

In sum, we, like the district court, "can find no rational basis for the Arbitrator's award;" and we therefore agree that the district court was "compelled to modify the award...."

### Conclusion

The bedrock of judicial enforceability of, *first*, the promise to arbitrate, and, *second*, the arbitral award, is the Supreme Court's admonition that the arbitrator's "award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Steelworkers*, 363 U.S. at 597, 80 S.Ct. at 1361. *See* Wellington, *Judicial Review of the Promise to Arbitrate*, 37 N.Y.U.L.Rev. 470 (1962). The arbitral award that fails that test is entitled to no deference.

The judgment of the district court is affirmed.

MANSMANN, Circuit Judge, dissenting.

This appeal once again requires us to apply the standards governing the judicial review of arbitration awards. The law in this area is well-settled. We are required to affirm the arbitrator's decision "so long as it draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) ("*Enterprise Wheel*"). The dispute before us involves the application of that law. Because I believe that the majority and the district court err in finding that the award does not draw its essence from the collective bargaining agreement, I would reverse the entry of summary judgment.

### I.

"When the parties include an arbitration clause in their collective-bargaining agreement, they choose to have disputes concerning constructions of the contract resolved by the arbitrator." *W.R. Grace & Co. v. Local Union 759, International Un-*

---

5. Those who are troubled by the notion of an "increase" of "zero" may find it easier to think of increases of, respectively, $38 (The Post), $38 (The News) and $38 + $25.93 + $.72 (The Times). The average of these increases is also $46.88.

6. Judge Mansmann's dissenting opinion argues that, "[b]y focusing on what it calls the 'flawed arithmetic' of the arbitrator, the majority fails to concentrate on what should be the central determination: whether there is any rational basis in the record for the award." Judge Mansmann's review of the testimony heard by the Arbitrator leads her to conclude that "the arbitrator's award can be interpreted as having a rational basis in the record. The strong national policy favoring the arbitration of labor disputes requires no more than that."

Giving full scope to the dissent's valiant effort to impute rationality to the arbitral award, we are persuaded that the Arbitrator's own exposition of his thought processes shields the award from that imputation. And we do not think that the "strong national policy favoring the arbitration of labor disputes"—a policy to which, as judges, we unreservedly subscribe—requires a court to disregard what an arbitrator says in order to justify what the arbitrator does.

ion of *United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983). The judicial scope of review over arbitrators' decisions is therefore extremely narrow. "[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." *Id.*

Courts must defer even to arbitrators' decisions which may be ambiguous. As the Supreme Court of the United States explained:

Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement.

*Enterprise Wheel*, 363 U.S. at 598, 80 S.Ct. at 1361 (footnote omitted). In the absence of a violation of a specific command of law, fraud, partiality, or other misconduct on the part of the arbitrator, a reviewing court may disturb an award "only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop." *Id.* at 1128 & n. 27. We will affirm an award "if the [arbitrator's] interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969).

## II.

In arriving at its determination that the arbitrator's award does not draw its essence from the collective bargaining agreement, the majority erroneously focuses on mathematical formulas and its own interpretation of the language of the agreement. I believe that the majority's approach is error and that the arbitrator's award should be affirmed.

The collective bargaining agreement provides that composing room employees, who are members of the defendant union, will receive increases equal to the weekly increases and cost-of-living adjustments negotiated by the New York Typographical Union No. 6 ("New York Union") under its agreement with the Publisher's Association of New York City ("Publishers' Association"). The agreement also provides:

In the event that the Publishers' Association of New York City is disbanded or ceases to negotiate for more than one daily newspaper in New York City, then the increases under this Contract shall be the average increases received by the New York Times, New York Daily News and New York Post, to the extent that there are increases granted to any employees under said contract.

It is the arbitrator's interpretation of this provision which is at issue.

The Publishers' Association did not participate in the negotiations with the New York Union in 1984. Instead, each of the three New York papers listed in section 7–09 reached separate agreements with the union. The employees of all three papers received a weekly wage increase of $38. The employees of the News and the Post also received a lump-sum profit-sharing provision. The employees of the Times, in lieu of a profit-sharing provision, received an additional weekly wage increase of $25.93 plus a $.72 cost of living increase.

The arbitrator decided that the plaintiff's employees were entitled to the increases negotiated by the Times: $38 plus $25.93, in lieu of profit-sharing, and $.72, cost of living increase, or a $64.65 weekly increase. The arbitrator reasoned, in part:

If News and Post employee[s] received bonuses, which are not increases, and Times employees received permanent increases, the average of the increases can not be determined, but any increases granted to any employees under said contract shall be.

Concluding that the arbitrator's award has no rational basis in the record, the

majority rejects the decision. The majority explains:

> To say that "the average of the increases can not be determined," where one of the increases is $25.93, plus $.72 cost-of-living, and the other two are zero, is flawed arithmetic. The average can be determined. The average is $8.64, plus $.24, for a total of $8.88. The sum of $8.88 and $38.00 (the base wage increase granted by all three dailies, and conceded by The Ledger) is $46.88, the weekly wage increase determined by the district court to be owing to The Ledger's composing room force.

The majority adds in a footnote:

> Those who are troubled by the notion of an "increase" of "zero" may find it easier to think of increases of, respectively, $38 (The Post), $38 (The News) and $38 + $25.93 + $.72 (The Times). The average of these increases is also $46.88.

In so holding, the majority ignores the admonition of Professor Summers, which it quotes in its decision:

> The court should give full recognition to the expertness of the arbitrator and due deference to the choice of the parties, and substitute its judgment for that of the arbitrator only when he was so palpably wrong that to allow his decision to stand would undermine confidence in the arbitration process itself. The test, however, can not be embodied in immutable words, for it is an attitude of tolerance and humility, not a mathematical formula.

Summers, *Judicial Review of Labor Arbitration*, 2 Buffalo L.Rev. 1, 24 (1952). By focusing on what it calls the "flawed arithmetic" of the arbitrator, the majority fails to concentrate on what should be the central determination: whether there is any rational basis in the record for the award.

Although it is ambiguous in part, the arbitrator's decision does draw its essence from the collective bargaining agreement. The arbitrator found that the Times employees had received wage increases for purposes of section 7–09. The arbitrator also found that the Times employees received those increases in lieu of the profit-sharing plans received by the News and the Post employees. Both the profit-sharing plans and the Times increases were equivalent to approximately a 4% increase in wages.

The arbitrator implicitly found that the parties to the collective bargaining agreement did not anticipate the use of profit-sharing plans as compared to traditional wage increases. Indeed, the record reflects that the profit-sharing schemes were adopted because the News and the Post were in financial trouble—the Times was not. The arbitrator apparently desired to afford some weight to the profit-sharing plans but concluded that it was impossible to average the three plans. Thus, he awarded the full amount of the Times increases.

The arbitrator's award is supported by evidence in the record indicating that under previous "me too" wage provisions the plaintiff had paid increases equal to the total value of the benefits package negotiated by the New York Union. The only two witnesses at the arbitrator's hearing both testified that in the New York negotiations the parties negotiated a lump sum increase which included wages and other benefits. David Crocket, Vice-president and newspaper representative of the New York Union, testified:

> Well, let's say we negotiate $12. We did that in 1965, exactly $12. Then we decided from the $12 to allocate, if the members so desire by referendum, vote monies to welfare, to pension, to anything else they may want to buy under the contract.

Albert Chodash, a member of the defendant who participated in the negotiations with the plaintiff, testified that the defendant would receive the full amount of any package negotiated by the New York Union. Mr. Chodash explained under cross-examination by the plaintiff's counsel:

> There is no direct provision for a bonus. However, it was understood that any monies received by New York Typo-

**170**

graphical Union we would get. As an example, you mentioned vacations. If they received—and I'm using an arbitrary figure of $20 and they took $10 to buy vacations, while you may not allow us to buy vacations, you would have given us the $20. You have through the 10 years, whatever the amount was, no matter what they did with it.

In light of the testimony at the hearing, I am unwilling to find that the arbitrator's award does not have a rational basis in the record. The arbitrator may legitimately draw upon the history between the parties, the so-called "law of the shop," in addition to principles of contract construction. *Ludwig Honold Mfg. Co.*, 405 F.2d at 1128. In the absence of a direct conflict between the award and the language of the collective bargaining agreement, we should enforce the arbitrator's interpretation of the agreement and the law of the shop. *See Super Tire Engineering Co. v. Teamsters Local Union No. 676*, 721 F.2d 121, 124 (3d Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984).

The majority errs when it ignores the arbitrator's view and applies its own principles of contract interpretation. *United Steelworkers of America, AFL–CIO v. American Smelting & Refining Co.*, 648 F.2d 863, 869 (3d Cir.1981) ("Although these are forceful arguments as a matter of contract interpretation, courts are not free to refuse to vacate arbitration awards merely because they might have interpreted the contract differently were it up to them in the first instance."), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). The courts are not permitted to "disturb ambiguous, unclear, and even deliberately opaque arbitration opinions because 'the policy in favor of the peaceful resolution of labor disputes through arbitration outweighs any damage which arbitration might cause.'" *Arco-Polymers, Inc. v. Local 8–74,* 671 F.2d 752, 755 (3d Cir.) (quoting *Amalgamated Meat Cutters & Butchers Workmen of North America, Local 195, AFL–CIO v. Cross Brothers Meat Packers, Inc.,* 518 F.2d 1113, 1120 (3d Cir.1975)), *cert. denied,* 459 U.S. 828, 103

S.Ct. 63, 74 L.Ed.2d 65 (1982). Indeed, as we said in *Ludwig Honold Mfg. Co.,* " 'whether the arbitrators misconstrued a contract' does not open the award to judicial review." 405 F.2d at 1128 (citation omitted).

I believe the arbitrator's award can be interpreted as having a rational basis in the record. The strong national policy favoring the arbitration of labor disputes requires no more than that.

### III.

Because I believe that the arbitrator's award "draws its essence from the collective bargaining agreement, I would reverse the decision of the district court and reinstate the award of the arbitrator.