MITCHELL PLASTICS, INC., Plaintiff,

v.

GLASS, MOLDERS, POTTERY, PLAS-
TICS AND ALLIED WORKERS IN-
TERNATIONAL UNION and Local 46B,
Defendants.

Civil Action No. 95–2015.

United States District Court,
W.D. Pennsylvania.

Nov. 20, 1996.

**402**

John M. Cerilli, Paul Amato, Buchanan Ingersoll, Pittsburgh, PA.

Mimi C. Satter, Satter & Connor, Syracuse, NY.

## MEMORANDUM OPINION

CINDRICH, District Judge.

This is an action to vacate a labor arbitration award with a counterclaim to enforce the award. Plaintiff's ("Mitchell") cause of action arises under the Labor–Management Relations Act, 29 U.S.C. § 185, and the Arbitration Act, 9 U.S.C. § 10. Pending before the court are cross-motions for summary judgment. We observe at the outset that this case is well-suited for summary judgment in that none of the facts material to the court's decision are disputed. Also pending is defendants' ("Union") motion for attorneys' fees under Federal Rule of Civil Procedure 11 and the court's inherent powers.

### I. *Facts*

The facts can be briefly stated. Mitchell is located in Indianola, Pennsylvania. It manufactures custom injected molded plastic parts. The Union is the exclusive labor representative for employees at Mitchell's plant. Mitchell and the Union were parties to a collective bargaining agreement ("CBA") effective from November 5, 1989 to November 4, 1993.

Daniel Navilliat was an employee and Union member with six years of service as of January 1995. On January 14, 1995,[1] Navilliat was on duty as a material handler. When an alarm sounded on a particular mold press, Navilliat responded and tried to troubleshoot the problem. Navilliat opened the mold door and found nothing that would suggest a problem. He closed the door, put the machine on manual, and mistakenly pushed the "mold open" button. The mold opened too far and bent the gear rod.

The consequences of Navilliat's actions were substantial. A contractor had to be summoned to repair the press, which was owned by one of Mitchell's best customers. Mitchell lost one of its best customers and a significant volume of business.[2]

Later that day, Mitchell fired Navilliat for violation of one of its work rules. The work rule is one of twenty-seven regulating employee conduct imposed in September 1993. Exh. B to Mitchell's Cross–Motion for Summary Judgment, Doc. No. 13. The rules are divided by the type of discipline their violation carries. The first rule of those whose violation may result in immediate termination applies to "[c]areless or willful destruction or damage to Company property, or property of another employee or customer." Navilliat's discharge was based on this rule. There is no question that he was aware of these rules.

Navilliat brought a grievance against his termination that proceeded to binding arbitration, as provided by the CBA. The arbitrator conducted hearings on June 21 and October 31, 1995. He made his award pursu-

---

1. Though this incident occurred after the nominal expiration date of the CBA furnished by the parties, we assume the CBA was extended. Both sides argue its applicability, and the CBA itself expressly provides for indefinite renewal unless one party gives notice of termination. Mitchell's Cross–Motion for Summary Judgment, Doc. No. 13 ("Mitchell SJ Br."), Ex. A at 34.

2. Mitchell says in its Complaint that the mold press Navilliat damaged was worth $100,000, but it does not put a price on the actual damage. Compl. ¶ 16. Still, there is no dispute that the company's losses, whatever the exact figures, were large. The Union accepts that they were approximately one-third of the employer's business volume. Memorandum in Support of Defendants' Motion for Summary Judgment ("Defs' SJ Br."), Doc. No. 11, at 4. We proceed with that conclusion in mind.

ant to a written opinion dated November 14, 1995. The arbitrator granted the grievance and reduced the discipline to thirty days' suspension. Mitchell's SJ Br.Exh. C. In sum, the arbitrator found that not all acts of carelessness justified immediate discharge. While the work rule against careless destruction of property in theory empowers Mitchell to discharge an employee for any infraction of that rule, the arbitrator found that such a theory could not be squared with the "proper cause" standard for discharge in the CBA. As he put it, "[e]very act of carelessness most emphatically cannot warrant immediate termination because that result is simply not compatible with the just cause standard." *Id.* at 7.

In its cross-motion, Mitchell argues first that the arbitrator did not abide by the terms of the CBA in rewriting the work rule to nullify termination for damage to company property. Its second argument is that, even if the arbitrator did abide by the terms of the CBA, he failed to adhere to his own interpretation in applying the CBA to the facts of this case. The Union's motion asserts that the arbitrator's decision easily draws its essence from the contract and therefore should be enforced. The Union also contends that there is no merit to Mitchell's Complaint under well established, controlling precedent.

## II. *Summary Judgment Standard*

Summary judgment is mandated where the pleadings and evidence on file show there is no genuine dispute of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue does not arise unless the evidence, viewed in the light most favorable to the nonmoving party, would allow a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). A fact is material when it might

affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. at 2510. In reviewing any facts alleged to create a genuine issue, if the Court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. *Governing Law*

 Attempts to overturn arbitration awards face a well established, consistent, and exceedingly narrow standard of review. *United Industrial Workers v. Gov't of the Virgin Islands,* 987 F.2d 162, 170 (3d Cir. 1993) (scope of review is "narrowly circumscribed"); *Newark Morning Ledger Co. v. Newark Typographical Union,* 797 F.2d 162, 165 (3d Cir.1986) (the "strict standard means that a reviewing court will decline to sustain an award 'only in the rarest case'"); *NF & M Corp. v. United Steelworkers,* 524 F.2d 756, 759 (3d Cir.1975) ("scope of judicial review of an arbitrator's award is severely limited"). "If the arbitrator's award can possibly derive from an interpretation and application of the clauses of the agreement, the courts are precluded from refusing to enforce his award." *Arco Polymers, Inc. v. Local 8–74,* 671 F.2d 752, 755 (3d Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

> As long as an arbitrator's decision arguably "draws its essence" from the CBA, a district court is not permitted to vacate the award. "An arbitration award draws its essence from the bargaining agreement if 'the interpretation can in *any rational way* be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention.'"

*United Transp'n Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376 (3d Cir.1995) (citations omitted). "A court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract ... or because it believes its interpretation of the contract is better than that of the

arbitrator." *News America Publications, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir.1990). "A labor arbitration decision fails to draw its essence from the collective bargaining agreement if the arbitrator acted in manifest disregard of the law, or if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination." *United Industrial Workers*, 987 F.2d at 170.[3]

Given this strong language, we need not elaborate on the degree of caution parties and counsel should exercise before attempting to overcome it.

## IV. *Discussion*

### A. *Contract Terms*

Article III of the CBA establish Mitchell's management rights and right to set work rules, and contains most of the language relevant to this dispute.[4] There are grievance and arbitration provisions about which there is no disagreement.[5] Mitchell SJ Br. Exh. A at 18–22.

### B. *Review of the Arbitration Decision*

█ Mitchell makes two arguments on the merits, which it summed up as follows: "By rewriting the rule to limit Mitchell Plastics' right to discipline employees for careless damage to property and to mandate different penalties for such infractions, the Arbitrator overstepped his authority and usurped Mitchell Plastics' rights under the Agreement." Mitchell SJ Br. at 19–20. Mitchell makes these arguments despite precedent from the United States Court of Appeals for the Third Circuit that Mitchell recognizes as an impediment to its case. It cites *United Transp'n Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376 (3d Cir.1995), as a "hurdle in front of parties attempting to vacate an arbitrator's award." Mitchell SJ Br. at 11.

Mitchell's latter argument about imposing penalties other than those the parties allegedly contemplated is quickly disposed of by reference to *Local 1589*. The court of appeals there cites a previous opinion which stated that " '[i]n a proper case, an arbitrator ... may determine that certain conduct is "just cause" for discipline but not for discharge.' " *Arco Polymers, Inc. v. Local 8–74*, 671 F.2d 752, 756 (3d Cir.1982) (quoting *Mistletoe Express Service v. Motor Expressmen's Union*, 566 F.2d 692, 695 (10th Cir. 1977)). Thus, in *Arco Polymers*, the Third Circuit accepted the rule that arbitrators do not necessarily go beyond the contract in changing discharge to something less severe.

In *Local 1589*, the Third Circuit emphatically applied this rule. The district court had found that the arbitrator read into the

3. As rare as it is for a court to vacate an arbitration award, the Third Circuit recently did so in *Matteson v. Ryder System, Inc.*, 99 F.3d 108 (3d Cir.1996). *Matteson* concerned the determination of the scope of issues submitted to the arbitrators. The court found the submission of issues highly disorganized, but decided that only one matter was consistently pursued by the grievants. Since the arbitrators decided several other issues relating to compensation, the court found that they exceeded the scope of authority properly conferred on them. Because the issues are different, *Matteson* has little effect on this case.

4. Article III states:
The right and duty of the Company to freely manage its business in all respects shall not be diminished except as expressly limited by this Agreement. The rights reserved to Management include all those normal to business management including but not limited to the right to manage the plant and direct the working forces, to discharge or discipline for proper cause....

In effectuating the above rights the Company shall have the right to establish plant rules and regulations and discipline employees, provided that such discipline is not arbitrary, capricious or discriminatory, and that any such alleged action upon the part of the Company is subject to the grievance procedure.
Mitchell SJ Br.Exh. A at 3–4.

5. Article IX of the CBA states:
B. The power and authority of the arbitrator shall be limited to the interpretation and application of the specific written provisions of this Agreement and he shall have no power or authority to add to, detract from, alter or amend said Agreement in any way or to consider differences respecting the general wage or benefit level.
C. The decision of the arbitrator on a matter properly before him, within the limits of his jurisdiction, shall be final and binding between the parties hereto.
Mitchell SJ Br.Exh. A at 21–22.

CBA terms that were not there, such as retraining and progressive discipline. Reversing this decision, the court of appeals determined that the arbitrator did not read into or amend the contract when he altered a bus driver's discharge because of his third preventable rear end collision in twelve years, in addition to six other preventable accidents. Rather, the decision to change the driver's discipline from discharge to suspension and retraining was the foreseeable result of an undefined use of the term "proper cause" in the parties' CBA. Having failed to define the term, the court decided, the parties can be said to have bargained for the arbitrator's interpretation. That the employer's definition of proper cause differed from the arbitrator's was not grounds to invalidate the arbitrator's decision.

This same analysis explains why the arbitrator cannot be said to have rewritten the work rule in any way that would remotely support vacating the award. As in *Local 1589*, an ambiguity needed to be resolved. The work rule provides for termination for "careless or willful destruction or damage to Company property, or property of another employee or customer." This language is extremely broad. Obvious examples spring to mind, but beyond that, the rule is laced with vagueness. Would Mitchell really intend to fire one of its workers for being inattentive—careless—and breaking a fellow worker's coffee cup? If an employee bent a company screwdriver while prying apart two stuck parts, knowing the screwdriver would bend but thinking this method of repair necessary, would that constitute willful damage to company property? The answers to these questions seem obvious as well. This does not prevent them or questions like them from arising under the language of the work rule, and creating arbitrable disputes.

Rigid interpretation of this work rule would not promote peace and efficiency in the shop, but instead would achieve the opposite, to the disadvantage of both sides. This state of affairs created by the language of the work rule called for an effort to define the rule to give it practical, reasonable, and foreseeable consequences. In other words, this was the type of problem that the parties

bargained to have resolved by an arbitrator. Disagreement with his interpretation will not support overturning his award, as counsel must know from controlling case law.

But even apart from the independent task of giving this work rule a reasonable interpretation, the arbitrator was bound to interpret the work rule in harmony with other parts of the CBA to give effect to all intentions of the parties, a canon of contract construction. This is what he did in relying on the proper cause standard for discharge. And this is what the Third Circuit expressly approved in *Local 1589* in circumstances even more favorable to the employer's position than here.

Mitchell's arguments rest on semantics and failure to adequately address one of the key terms of the CBA and this case: the "proper cause" standard for discipline and discharge. Discharge under the work rule cannot be seen in isolation from the proper cause standard for discipline, since both have a binding effect on the parties. Because the work rule and the proper cause standard for discharge are expressly stated in the CBA, and because the essence of this dispute was to interpret and reconcile these terms, the arbitrator's decision most certainly draws its essence from the CBA.

Mitchell relies on *Bruno's, Inc. v. United Food & Commercial Workers Int'l Union, Local 1657*, 858 F.2d 1529 (11th Cir.1988) in defense of its position. *Bruno's* involved a decision in which an arbitrator found a contract violation when a supermarket changed its level of discipline. A cashier's failure to ring up items in the bottom level of shopping carts first drew a letter of reprimand, and a day's suspension on the third violation. The supermarket then unilaterally changed its policy to require a one day suspension on the first offense. The arbitrator decided that this policy was void, and that a new policy should be instituted. "The arbitrator specifically outlined the new policy, which included less severe fines for first offenses and more direct management monitoring." 858 F.2d at 1531.

The Eleventh Circuit observed as it must the narrow standard of review. It decided, however, that the arbitrator's imposition of a

new disciplinary policy went outside the bounds of the contract. The court found that establishing store rules and operating procedures was a function exclusively reserved to the supermarket by contract, and that the arbitrator had encroached on this management right.

The easy answer to *Bruno's* and cases like it is to cite *Local 1589.* To the extent they reach results different than *Local 1589* on the same issue, we are bound to follow the Third Circuit. It seems too elementary to mention, but the court is continually surprised at the insufficient attention paid to the idea that the binding effect of law is based on a fairly rigid hierarchy, and that sensitivity to this hierarchy is the most reliable form of persuasion. Many issues in cases, and cases themselves, are resolvable by a more sober assessment of the effect of Third Circuit precedent. The Third Circuit binds all within its jurisdiction. If there is a Third Circuit decision on an issue close to the one being decided, counsel must address the substance of it. It is as simple as that, since the Third Circuit has decided almost all of the issues we see. Conscientious representation requires no less. This is to be contrasted with the ignorance or avoidance of Third Circuit law that we see in many briefs, in the apparent belief that we owe similar allegiance to any other court (besides the Supreme Court of the United States) simply because that court has ruled in favor of the party's position.

*Bruno's* is also distinguishable on its facts. There, the arbitrator imposed affirmative new obligations on the company, as noted above. Here, the arbitrator did not create a new standard. Rather, he applied an existing standard—proper cause—to Mitchell's new work rule in order to reconcile the two clauses. This does not create a new obligation and does not change the contract. The arbitrator did change the discipline from

discharge to suspension, to which Mitchell strongly objects. But even the *Bruno* court accepts that "arbitrators have broad powers to craft appropriate relief." 858 F.2d at 1531. A remedy short of discharge was appropriate in this case because of the vagueness of the work rule, and the arbitrator's sensible conclusion that not all damage or destruction justified discharge. That being so, the arbitrator was compelled by his interpretation to find a form of discipline consistent with his findings. Simply because Mitchell did not foresee this outcome, or does not agree with it, does not lead to the conclusion that it is beyond the terms of the CBA. The arbitrator did not, as in *Bruno's,* establish new disciplinary policies.

## V. *Attorneys' Fees*

■ The Union seeks attorneys' fees under Federal Rule of Civil Procedure 11 and the court's inherent powers, contending that Mitchell's position has no basis in law. The Union states that it warned Mitchell of its intention to seek such fees in advance of its motion for summary judgment to allow Mitchell to withdraw its action without risking such liability.

Mitchell asserts that it was merely exercising its right to protect the integrity of the CBA. As on the merits Mitchell argues that the Arbitrator rewrote the work rule, and this action was necessary to preserve its management right to impose work rules.[6]

■ Rule 11(b)(2) requires that a party's pleadings and motions be warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. "[T]he intended goal of Rule 11 is accountability." *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 94 (3d Cir.1988). Rule 11 sanctions are based on an objective standard of reasonableness under the circumstances. *Id.* Rule 11 " 'imposes on counsel a duty to look

---

**6.** Mitchell originally claimed in its Complaint that the arbitrator's decision was against public policy. Compl. ¶ 24. Mitchell dropped any public policy argument in its summary judgment brief. Mitchell SJ Br. at 2 n. 1. While not conclusive on the issue of sanctions, Mitchell's conduct in discarding a claim before the point of asking for judgment on it does say something

about the degree of care it applied in bringing the Complaint. The court finds it extremely difficult to comprehend how even the *allegation* of a public policy interest might arise in this case. *See, e.g., Local 1589,* 51 F.3d at 381 (describing circumstances when public policy argument applies).

before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to "stop, look, and listen." ' " *Id.*, (quoting *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 157 (3d Cir.1986)).

The Third Circuit had the occasion to consider Rule 11 sanctions in an arbitration case in *Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66 (3d Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988), on which Mitchell relies in opposing sanctions. In *Local 430*, the court reversed a district court decision imposing Rule 11 sanctions against a union in a case involving successor obligations under a collective bargaining agreement. The union also failed to support its allegations in opposing the companies' summary judgment motions. The Third Circuit found that "[t]he complaint in this case relied upon an expanded theory of the arbitrability of successor liability which, while novel and unsuccessful, was not plainly unreasonable." *Id.* at 70. We cannot say as much for Mitchell's Complaint, which appears to rest only on disagreement with the arbitrator's decision. *Local 430* also mandates great caution in considering Rule 11 sanctions, which we believe we have exercised. *Local 430* is sufficiently different from this case for us to find it does not control the imposition of sanctions.

In this case, the circumstances counselled strongly against litigation. The reasons are easily discernible. First, attempts to overturn arbitration awards face a rigorously applied and extremely narrow standard of review, as set forth above. One purpose of this standard, of course, is to avoid exactly what we are doing now—entertaining the parties' contentions in a lawsuit—when the parties, for the proven benefit of all involved, have agreed to take their contract disputes elsewhere. For this reason, we are much less sensitive to a factor to which courts must always be aware when its power to review a dispute is restrained for any reason: the ability of an aggrieved party to have its day in court. The fact is, the parties themselves

have decided that they prefer *not* to take their labor disputes to court. It is not necessary to list the advantages of this approach, fully admitting the occasional perceived injustice that may result.[7] One's day in court can be a burden as well as a benefit because of cost, delay, and extended friction in the workplace. Employers and unions in any given trade have wisely recognized this truth as it applies to disputes between them.

A second reason against filing the Complaint is precedent from the Third Circuit that Mitchell recognized as an obstacle to its case. It cites *Local 1589* as a "hurdle in front of parties attempting to vacate an arbitrator's award." Mitchell SJ Br. at 11. Simply citing the case reveals two characteristics about which there can be no dispute: it is binding, and it is recent. For those reasons alone, precedent that is not binding, or not recent, should be carefully scrutinized to determine how it might disclose a path to deciding this case that is better than, or not covered by, binding, recent law. Rather than a hurdle, which, at least in sports, runners almost always reach the other side of, binding, recent authority is better viewed as a wall. The complaining party must be prepared to show us exactly where the door is and the key to unlock it.

Mitchell's efforts fall far short. It repeatedly contends that the arbitrator rewrote the work rule. Merely saying this does not make it so. The ambiguity of the work rule is apparent on its face, which is not the case for other rules in the same list. Perhaps it is possible for questions to arise as to the interpretation of the work rules prohibiting punching another employee's time card, or gambling on company premises, for example, but the subject matter and phrasing of the rules make such questions much less likely. The arbitrator did not "rewrite" the work rule; he compared it to other language in the contract essential to any determination of whether a discharge is appropriate. Thus, this argument does not convince us of the need for a lawsuit.

---

7. *See, e.g., Amalgamated Meat Cutters Local 195 v. Cross Brothers Meat Packers, Inc.*, 518 F.2d 1113, 1120 (3d Cir.1975) ("the policy in favor of the peaceful resolution of labor disputes through arbitration outweighs any damage which arbitration might cause to the Supply unit's right to picket").

Next, Mitchell argues that the arbitrator failed to adhere to his own interpretation of the agreement. That is, the arbitrator found that substantial damage had been done, but would not impose discharge as a penalty. Mitchell's argument seems to rest on the notion that any damage found "substantial" must be met with discharge. This does not necessarily follow. Depending on the circumstances, there can be substantial damage to an expensive item, or substantial damage to an inexpensive item, with different expectations of care. Or, as the arbitrator said, there can be vindictive damage to an inexpensive item that reveals much about the worth and attitude of an employee. Whether discharge is appropriate must be decided case by case because the term "substantial" represents a range of meaning and severity. Though he made this observation, the arbitrator did not, as Mitchell contends, impose his own system of penalties for damage to company property. There is nothing stopping another arbitrator from upholding the termination penalty in a different case.

Mitchell's arguments against attorneys' fees are the same as those it advances on the merits: conclusory, without support in the facts or law. Mitchell's failure to discuss or attempt to distinguish two matters—the proper cause standard and *Local 1589*—stamps its arguments as hollow. By failing to grapple forthrightly with these key issues, Mitchell was not being creative or enthusiastic or adventuresome. Here, Mitchell was simply prolonging a process which a reasonable investigation of the law would have revealed was at its end. This view should have been expressed by Mitchell's counsel, if by no one else. Thus we cannot find that Mitchell's claims are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

Moreover, these justifications for resisting established law must be watered down in an arbitration review case. We are not addressing constitutional rights, for example, in whose protection courts have a special role. Instead we are called into a dispute that the parties themselves have agreed to take elsewhere. Given this direct expression by the parties against court review, we are not justified in encouraging creativity to escape this bargain when a party loses arbitration. *Newark Morning Ledger Co. v. Newark Typographical Union*, 797 F.2d 162, 165 (3d Cir.1986) ("frequent judicial disapproval of the awards of labor arbitrators would tend to undermine a system of private ordering that is of the highest importance to the well-being of employer and worker alike"); *Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 43 n. 2 (3d Cir.1985) ("[i]n suits to compel one party to submit to arbitration or abide by an award, fees are generally awarded if the defaulting party acted without justification, ... or if the party resisting arbitration did not have a reasonable chance to prevail") (citations omitted).[8] That is, we should resist interfering in a voluntary choice of the parties by blindly accepting that appeals from arbitration awards are cases like any other. Like the policy favoring settlement of cases, the policy favoring arbitration of disputes rests on the same foundation of court respect for dispute resolution agreements. This is not to say that we are precluding a party that seeks to overturn an arbitration award from being creative. Rather, the party who challenges an arbitration award simply must give closer scrutiny to his decision, leaving as little room as possible for the risk that his creativity will be construed as a repudiation of his own choice that courts properly should discourage.

In years past, law firm letterhead would often bear the inscription "attorneys and counsellors at law." This practice has waned, and we rarely see those paired words.

---

**8.** As Judge Posner has persuasively written:

[T]he amended Rule 11 makes clear that he who seeks vindication [by challenging an arbitration decision] and fails to get it must pay his opponent's reasonable attorney's fees. A company dissatisfied with the decisions of labor arbitrators need not include an arbitration clause in its collective bargaining contracts,

but having agreed to include such a clause it will not be permitted to nullify the advantages to the union by spinning out the arbitral process unconscionably through the filing of meritless suits and appeals.

*Dreis & Krump Mfg. Co. v. Int'l Ass'n of Machinists*, 802 F.2d 247, 255 (7th Cir.1986) (imposing Rule 11 sanctions).

Firms should revive the practice; it might remind lawyers about the "counsellor" aspect of their profession. Part of that aspect involves listening, understanding, researching, and advising. It might not involve litigating, where there is a slight but, it is to be hoped (for the sake of all the participants in the legal system), firm risk that a damn-the-consequences plunge into the court system will backfire, in the form of sanctions against the claimant. Indeed, because of such a risk and for other reasons of common sense, the counselling might involve actively advising against litigation. That is where the lawyer's judgment—his or her stock-in-trade, and by definition an uncertain enterprise—comes into play.

Mitchell had an opportunity to withdraw its claims up to the time the Union moved for summary judgment, but decided otherwise. If the Union has complied with the conditions of Rule 11, we will award attorneys' fees for all time incurred by the Union after notification to Mitchell that it intended to move for summary judgment and seek sanctions, stating the grounds therefore. As explained above, this award is based on the type of case this is, the clarity of controlling precedent of which plaintiff was aware, plaintiff's failure to find a legitimate basis on which to challenge the controlling precedent, and its failure to address an obvious and key justification for the arbitrator's decision.

An order consistent with this memorandum opinion will be entered.

### ORDER

In accordance with the accompanying memorandum opinion:

1. Plaintiff's Cross–Motion for Summary Judgment (Doc. No. 13) is DENIED.

2. Defendants' Motion for Summary Judgment (Doc. No. 8) is GRANTED.

3. The November 14, 1995 arbitration decision at issue is valid and enforceable, and shall be followed by the parties.

4. Defendants' Motion for Attorneys' Fees (Doc. No. 9) is GRANTED. The parties shall attempt to stipulate to an amount of fees incurred since the time defendants advised plaintiff of their intent to file their motion for sanctions. If the parties are unable to so stipulate, defendants shall file 20 days from the date of this order an accounting in support of their attorneys' hours and fees charged. Plaintiff may respond 20 days after defendants' accounting is filed.

5. Judgment is hereby entered for the defendants and against the plaintiff.