

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-17-2004

# Major League Umpires v. Amer League

Precedential or Non-Precedential: Precedential

Docket No. 02-1103

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Major League Umpires v. Amer League" (2004). *2004 Decisions.* Paper 953.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/953

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

Nos: 02-1103/1124/1276
_____

THE MAJOR LEAGUE UMPIRES
ASSOCIATION

v.

THE AMERICAN LEAGUE OF
PROFESSIONAL BASEBALL CLUBS;
THE NATIONAL LEAGUE OF
PROFESSIONAL BASEBALL CLUBS;
OFFICE OF THE COMMISSIONER OF
BASEBALL

(D.C. No. 01-cv-02790)

OFFICE OF THE COMMISSIONER OF
BASEBALL; AMERICAN LEAGUE
OF PROFESSIONAL BASEBALL
CLUBS; NATIONAL LEAGUE OF
PROFESSIONAL BASEBALL CLUBS

v.

MAJOR LEAGUE UMPIRES
ASSOCIATION; WORLD UMPIRES
ASSOCIATION

(D.C. No. 01-cv-02816)

The Major League Umpires Association,
Appellant No. 02-1103

_____

THE MAJOR LEAGUE UMPIRES
ASSOCIATION

v.

THE AMERICAN LEAGUE OF
PROFESSIONAL BASEBALL CLUBS;
THE NATIONAL LEAGUE
OF PROFESSIONAL BASEBALL
CLUBS; OFFICE OF THE
COMMISSIONER OF BASEBALL

(D.C. No. 01-cv-02790)

OFFICE OF THE COMMISSIONER OF
BASEBALL; AMERICAN LEAGUE
OF PROFESSIONAL BASEBALL
CLUBS; NATIONAL LEAGUE OF
PROFESSIONAL BASEBALL CLUBS

v.

MAJOR LEAGUE UMPIRES
ASSOCIATION; WORLD UMPIRES
ASSOCIATION

(D.C. No. 01-cv-02816)

Office of the Commissioner of Baseball;
American League of Professional
Baseball Clubs; National League of
Professional Baseball Clubs
        Appellants No. 02-1124

_____

THE MAJOR LEAGUE UMPIRES
ASSOCIATION
Appellant No. 02-1276

v.

THE AMERICAN LEAGUE OF
PROFESSIONAL BASEBALL CLUBS;
THE NATIONAL LEAGUE OF
PROFESSIONAL BASEBALL CLUBS;
OFFICE OF THE COMMISSIONER OF
BASEBALL

_____

Appeal from the United States District
Court for the Eastern District of
Pennsylvania
(D.C. Civil Action Nos. 01-cv-02790,
01-cv-02816)

District Judge:
Honorable Harvey Bartle, III

_____

Argued on December 9, 2002

Before: *BECKER, Chief Judge, ROTH
and SMITH, Circuit Judges
_____
        * Judge Becker's term as Chief
Judge ended on May 4, 2003.

(Opinion filed: February 17, 2004)

Patrick C. Campbell, Jr., Esquire
(**Argued**)
Phillips & Campbell, P.C.
314 North Middletown Road
Lima, PA 19037

Counsel for Appellant/Cross Appellee

Howard L. Ganz, Esquire
Neil H. Abramson, Esquire (**Argued**)
Daniel R. Halem
Proskauer Rose LLP
1585 Broadway
New York, New York 10036

Steven R. Wall, Esquire
Michael S. Burkhardt, Esquire
Megan E. Shafer, Esquire
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103

Counsel for Appellees/Cross-Appellants

_____

O P I N I O N

_____

ROTH, Circuit Judge:

This appeal involves a labor dispute
between Major League Baseball and its
umpires, the majority of whom resigned in
protest over what they viewed as
objectionable policies which the
Commissioner of Baseball sought to
implement during the 1999 season.
Although all of the resigning umpires
eventually attempted to rescind their letters
of resignation, the events that followed left
a substantial number of them unemployed.
The twenty-two unemployed umpires
subsequently filed grievances that were
submitted to an arbitrator.

The District Court confirmed the
Arbitrator's determination that the dispute
fell within the scope of the arbitration
clause of the collective bargaining

agreement (CBA), and further confirmed the Arbitrator's disposition of the grievances of nineteen of the umpires. In their appeals, both sides challenge the confirmation of the portions of the Award unfavorable to them. In addition, the Leagues contend that the dispute was not arbitrable in the first instance. For the reasons stated below, we will affirm the judgment of the District Court.

## I. Factual Background

The Major League Umpires Association (MLUA or Association) represents umpires employed by both the American League of Professional Baseball Clubs and the National League of Professional Baseball Clubs. The American and National Leagues together comprise what is commonly referred to as Major League Baseball (MLB). Each League has its own president, operates as a separate entity, and employs its own umpires. Generally speaking, the Commissioner of Baseball broadly oversees the operation of the Leagues and participates in decisions affecting the game as a whole. However, control over the employment and discipline of umpires has historically rested with the respective League presidents.

The dispute at issue arose during the 1999 baseball season over what the MLUA perceived as an attempt by the Commissioner of Baseball, Allan H. "Bud" Selig, to strip the League presidents of supervisory power over umpires and to centralize that power in the Commissioner's Office. Specifically, the MLUA believed that Commissioner Selig was attempting to implement various new policies that violated the CBA between the MLUA and the Leagues.[1]

To resolve its disputes with the Leagues, the MLUA attempted to force the Leagues to negotiate with it over the proposed new policies by organizing a mass resignation of its members. The MLUA apparently believed that, by electing to pursue a mass resignation strategy as opposed to a strike or other form of work stoppage, it could avoid violating the no-strike clause contained in the CBA[2] and force the Leagues to bargain

---

[1]These policies included proposals to (1) evaluate the consistency of individual umpires' interpretation of the strike zone; (2) utilize a computerized "pitch simulator" to improve umpire training; (3) use MLUA umpires to officiate an exhibition game to be played in Cuba without engaging in separate negotiations with the MLUA, as was purportedly the traditional method of addressing issues surrounding exhibition games; and (4) enlist the aid of club general managers to "chart" pitches in an effort to determine whether umpires were properly interpreting the------------------ strike zone. The MLUA viewed these proposals as violations of the existing CBA.

[2]The no-strike clause of Article XIX of the CBA states, in relevant part, that "the Association agrees that there shall

3

because the voluntary resignation of its members would trigger the Leagues' obligation to pay the resigning umpires approximately $15 million in severance compensation. Fifty-seven of the MLUA's sixty-eight members agreed to participate in the mass resignation; twenty-three from the American League and thirty-four from the National League. On July 15, 1999, each of the resigning umpires sent a letter to his respective League president stating that he resigned his position effective September 2, 1999. Umpires with more than ten years on the job also demanded severance pay due under the CBA as a result of voluntary termination.[3] In

be no strike nor other concerted work stoppage during the period of this Agreement and further that it will use its best efforts to cause each umpire faithfully to carry out their obligations as employees."

[3]The relevant portion of each letter stated as follows:

> Effective September 2, 1999, I hereby resign from my employment from the [American or National] League pursuant to Article VIII.D of the Basic Agreement between the American League of Professional Baseball Clubs, the National League of Professional Baseball Clubs and the Major League Umpires

addition, each of the fifty-seven resigning umpires executed a personal services agreement with the newly created Professional Umpire Services, Inc. These agreements stated, in relevant part, that the umpire would render services "exclusively for the Corporation and/or for the Person with whom the Corporation agrees to provide Umpire Services."

Articles of incorporation were filed for Professional Umpire Services on July 9, 1999, but the company never countersigned the personal services agreements or conducted any business. It appears the MLUA planned to use the company as a means of providing the Leagues with umpiring services in the event that the labor dispute was not resolved by the time the resignations took effect on September 2.

On July 22, Commissioner Selig met with American League President Gene Budig and National League President Leonard Coleman in Milwaukee, Wisconsin, in an effort to determine how best to respond to the resignations. After some discussion, the Leagues decided not to negotiate with the MLUA.

There are conflicting versions of what transpired at this meeting. The

> Association dated January 1, 1995. [Where applicable:] I hereby demand my voluntary termination pay.

4

MLUA contends that there was no immediate threat to the continuing operation of MLB, as the resignations did not become effective until several weeks after the meeting. It further argues that Commissioner Selig essentially forced the League presidents to begin hiring replacement umpires in an effort to manufacture a claim of detrimental reliance and to break the union. The Leagues counter that they viewed the mass resignation strategy as a violation of the CBA's "no-strike" clause, and therefore began hiring replacement umpires to ensure the continued operation of MLB during the upcoming League playoffs and World Series.

By the end of the day on July 22, the Leagues had hired a total of twenty replacement umpires (eight in the National League and twelve in the American League).[4] As a result, it soon became clear to MLUA members that the mass resignation strategy was a failure. Many began to rescind their letters of resignation. Despite the capitulation of some of its members, however, the MLUA continued to exert pressure on the Leagues. On July 23, it filed a declaratory judgment action in the Eastern District of Pennsylvania seeking to establish the resigning umpires' rights to termination pay and benefits.

Through a combination of new hires and resignation rescissions, the American League returned to full staff by July 26. In contrast, relatively few National League umpires had rescinded their resignations as of that date, and National League President Coleman hired five more replacement umpires. On July 27, the remaining thirty-two National League and six[5] American League umpires attempted to rescind their resignations *en masse*. However, because of the new hires and previous resignation rescissions, only nineteen National League positions remained open. As stated above, all of the American League positions had been filled by that date

Because he had no positions left to fill, American League President Budig simply refused to allow any of the final six American League umpires to rescind their resignations.[6] National League President

---

[4]The District Court puts the number at 17 (8 in the NL and 9 in the AL). However, the Arbitrator found 12 replacements in the AL, and thus 20 overall. As the Arbitrator was the fact-finder in this case, we have adopted his number.

[5]The District Court listed the names of seven AL umpires who tried to rescind on July 27, but the Arbitrator put the number at six. Again, we have adopted the Arbitrator's number.

[6]These umpires received a letter from American League President Budig stating, in relevant part:

> On July 15, 1999, I received from your union,

Coleman faced a more difficult situation, as he was forced to determine which of the remaining thirty-two National League umpires would be permitted to rescind their resignations. In order to make this determination, he invoked Article VIII A of the CBA, which provides in its second paragraph that "[a]ll umpires shall be selected or retained in the discretion of the League Presidents on the basis of merit and the skill of the umpire to perform to Major League standards." Applying this provision at least in part, Coleman selected nineteen umpires from the thirty-two and permitted those nineteen to rescind their letters of resignation. Coleman then accepted the resignations of the remaining thirteen National League umpires.

By the end of this imbroglio, twenty-two of the fifty-seven MLUA members who participated in the mass resignation scheme, nearly one-third of the Association's total membership, were unemployed (nine from the American

the Major League Umpires' Association, a letter from you dated July 14, 1999, resigning from your employment as an umpire with the American League. I deeply regret that you decided to take part in this concerted resignation plan instigated by the Major League Umpires' Association. However, you have left me with no choice but to accept your resignation and to fill the vacancy that your resignation has created along with the other vacancies that were created by this mass resignation strategy. The hiring process is now complete. The American League has hired a permanent employee to fill the vacancy created by your resignation and each resignation submitted by an American League umpire that was not rescinded.

Thank you for your service to the American League and I personally wish you the best in your future endeavors.

6

League and thirteen from the National League). All twenty-two of these umpires filed grievances under the CBA.

## II. Procedural History

The MLUA filed its Demand for Arbitration of the grievances on August 27, 1999. On August 30, the MLUA sought an injunction from the United States District Court for the Eastern District of Pennsylvania to prevent the Leagues from dismissing the twenty-two umpires whose resignations had been accepted and were due to take effect on September 2. The District Court held a hearing on September 1. Following this hearing, the parties executed a Memorandum of Understanding stating that the MLUA would withdraw its complaint and that the parties would submit the matter to an arbitrator. The Memorandum of Understanding also permitted either side to "raise in such arbitration whatever procedural and substantive arbitrability arguments . . . the parties may have."

In November 1999, the Leagues, contending that the dispute at issue did not fall within the scope of the CBA's arbitration provision, moved to dismiss the grievances. The Arbitrator denied this motion on November 26, 1999. Both sides were represented by counsel during the arbitration proceedings, which included seventeen days of testimony over the course of approximately one year.

Following completion of the proceedings, the Arbitrator issued his Opinion and Award on May 11, 2001. The Arbitrator sustained the grievances and ordered the reinstatement of two American League umpires (Coble and Kosc), and seven National League umpires (Darling, Hohn, Tata, Pulli, Poncino, West, and Vanover) with full back pay and benefits. It denied the grievances of all of the remaining American and National League umpires. Both sides subsequently filed actions in the Eastern District of Pennsylvania seeking to vacate the portions of the Award unfavorable to them. In addition, the Leagues challenged the Arbitrator's denial of their motion to dismiss the dispute as non-arbitrable.

The District Court held that the Leagues had properly preserved their objection to arbitrability. It nevertheless confirmed the Arbitrator's conclusion that the dispute was arbitrable. As for the merits of the parties' arguments, the District Court confirmed the Arbitrator's conclusion that the Leagues were entitled to hire replacement umpires in reliance on the letters of resignation submitted by the grievants, as well as confirming his determination that American League President Budig was not required to accept the six resignation rescissions submitted on July 27 in view of the fact that the American League was fully staffed by that date.

The District Court further confirmed the Arbitrator's application of the Article VIII "merit and skill" criteria to

the determinations made with respect to all but three of the National League umpires, and his decision, following this application, to require the National League to reinstate seven umpires (Darling, Hohn, Tata, Pulli, Poncino, West, and Vanover) who satisfied this criteria despite the fact that all National League positions had been filled. Finally, the District Court confirmed the Arbitrator's conclusion that three additional National League umpires (Davidson, Gregg, and Hallion) need not be reinstated because they failed to satisfy the Article VIII merit and skill criteria.[7] On appeal, both sides contend that the District Court erred in confirming the portions of the Award unfavorable to them. Additionally, the Leagues assert that the dispute at issue does not fall within the scope of the CBA's arbitration provision so that it was not arbitrable in the first instance.

---

[7]The District Court also confirmed the Award as to two American League umpires (Coble and Kosc) and vacated the portion of the Award that upheld the National League's discharge of three other umpires (Nauert, Dreckman, and Holbrook) with less than five years' experience. All five initially appealed this ruling, but have since settled their dispute. Thus, their claims are no longer before us, and we do not address them here.

## III. Jurisdiction and Standard of Review

The District Court reviewed the Arbitrator's Award pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. We have jurisdiction over the parties' cross-appeals of the District Court's final order pursuant to 28 U.S.C. § 1291. Our review of the District Court's ruling is plenary, and we apply the same test applied by the District Court. Pennsylvania Power Co. v. Local Union No. 272 of the Int'l Bhd. of Elec. Workers, AFL-CIO (Pennsylvania Power II), 276 F.3d 174, 178 (3d Cir. 2001).

## IV. Discussion

### A. Scope of Judicial Review of Arbitration Awards

We begin our analysis by examining the general legal principles governing federal courts' review of arbitration awards. The first step in any such review involves an examination of the sources of the arbitrator's authority. See Matteson v. Ryder System, Inc., 99 F.3d 108, 112 (3d Cir. 1996) ("Under the Federal Arbitration Act, a district court may vacate an arbitration award if, inter alia, 'the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'") (quoting 9 U.S.C. § 10(a)(4)). Simply stated, "an arbitrator may not venture beyond the bounds of his or her authority," which is defined not only by the terms of

the CBA, but also by the scope of the issues submitted by the parties. Id. Thus, "[i]t is the responsibility of the arbitrator in the first instance to interpret the scope of the parties' submission, but it is within the courts' province to review an arbitrator's interpretation." Id. at 113.

In conducting this review, "'the deference that is accorded to an arbitrator's interpretation of the collective bargaining agreement should also be accorded to an arbitrator's interpretation of the issue submitted.'" Id. (quoting Mobil Oil Corp. v. Independent Oil Workers Union, 679 F.2d 299, 302 (3d Cir. 1982)). This is so because (1) "a more searching judicial review of submissions . . . would undermine the congressional policy of promoting speedy, efficient, and inexpensive resolution of labor grievances"; (2) "interpretation of a submission must often occur in the context of the collective bargaining agreement itself," thereby resulting in an inconsistency if the arbitrator's interpretation of the CBA receives deference but his or her determination of the scope of the submission does not; and (3) "requiring courts to engage in a close examination of the submissions to arbitrators would put a considerable strain on judicial resources." Id. (citing Mobil Oil, 679 F.2d at 302).

Our role in reviewing the outcome of the arbitration proceedings is not to correct factual or legal errors made by an arbitrator.

Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement . . . . When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award.

Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (internal citations and quotations omitted). We should uphold an arbitration award that "draws its essence from the collective bargaining agreement" because "the parties to the collective bargaining agreement 'bargained for' a procedure in which an arbitrator would interpret the agreement." National Ass'n of Letter Carriers, AFL-CIO v. United States Postal Serv., 272 F.3d 182, 185 (3d Cir. 2001) (noting that a court should uphold an arbitration award) (citing Eastern Assoc. Coal Corp. v. United Mine Workers, 531 U.S. 57, 62 (2000)); United Indus. Workers v. Gov't of the V.I., 987 F.2d 162, 170 (3d Cir. 1993) (holding that a court may not "overrule an arbitration decision because it finds an error of law"); Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers of Am., 896 F.2d 745, 747 (3d Cir. 1990) (noting that,

9

because "the parties have bargained for the arbitrator's decision, 'it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. An award may fairly be said to "draw[] its essence from the bargaining agreement if the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." United Transportation Union Local 1589, 51 F.3d at 379-80 (internal quotations omitted).

Moreover, an award may be vacated if the arbitrator demonstrates manifest disregard for the CBA. See Newark Morning Ledger Co. v. Newark Typographical Union Local, 797 F.2d 162, 165 (3d Cir. 1986). Manifest disregard for the CBA is established when the arbitrator's award is "'totally unsupported by principles of contract construction.'" Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357, 360 (3d Cir. 1993) (quoting News Am. Publications v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir. 1990)).

In reviewing an arbitration award, courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." Tanoma Mining Co., 896 F.2d at 747 (citing United Paperworkers Int'l Union v. Misco, 484 U.S. 29, 37-38 (1987)); see also Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co., 868 F.2d 52, 56 (3d Cir. 1989) (concluding that "[i]t is not this Court's role . . . to sit

as the [arbitration] panel did and reexamine the evidence under the guise of determining whether the arbitrators exceeded their powers."). Rather, arbitration awards enjoy a strong presumption of correctness that may be overcome only in certain limited circumstances, as described above.

With this standard in mind, we turn now to the specific claims at issue here.

## B. Arbitrability

In addressing the threshold question of arbitrability, we first must determine whether the CBA empowers the Arbitrator to settle questions of substantive arbitrability, i.e., "whether a particular dispute is subject to the parties' contractual arbitration provision(s)." Bell Atlantic-Pennsylvania, Inc. v. Communications Workers of Am., 164 F.3d 197, 201 (3d Cir. 1999). As we have previously held, "[a]bsent a clear expression to the contrary in the parties' contract, substantive arbitrability determinations are to be made by a court and not an arbitrator." Id. at 200. Therefore, contract language submitting the issue of arbitrability to the arbitrator "must be clear and unmistakable." PaineWebber Inc. v. Hofmann, 984 F.2d 1372, 1379 n.4 (3d Cir. 1993).

Here, however, the Leagues conceded before the District Court that the issue of arbitrability was properly

10

submitted to the Arbitrator.[8]  We do not

therefore have to decide whether it was proper for the Arbitrator to determine arbitrability, merely whether he ignored the plain language of the CBA in his determination of arbitrability.  See National Ass'n of Letter Carriers, 272 F.3d at 186.  In doing so, we are obliged to give that decision "the same deference due an arbitrator's decision on the merits." United Indus. Workers, 987 F.2d at 167.  Thus, the Arbitrator's determination of arbitrability must be affirmed "as long as it 'draws its essence' from the collective bargaining agreement."  Pennsylvania Power Co. v. Local Union # 272 of the Int'l Bhd. of Elec. Workers, AFL-CIO, 886 F.2d 46, 48 (3d Cir. 1989).  As noted above, this requires only that the Arbitrator's interpretation of the CBA be rationally "derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties intention."  United Transportation Union Local 1589, 51 F.3d at 380 (citations and internal quotations omitted).

In presenting the issue to the Arbitrator in their motion to dismiss, the Leagues contended that the dispute was not arbitrable because Article VIII of the CBA gives the League Presidents the authority, following a hearing, to issue a "final and binding" decision regarding the termination of an umpire.[9]  The MLUA on

---

[8]  In response to the District Court's query about its standard of review of the arbitrator's decision on arbitrability, counsel for the Major Leagues responded:

> MR. GANZ:  If there is no rational – there has to be a rational basis for the arbitrator's determination, that he had authority, and that basis must draw its essence from the collective bargaining agreement.
>
> THE COURT:  Okay.  So there has to be a rational basis for the arbitrator's decision that this matter was subject to arbitration.
>
> MR. GANZ:  Correct, Your Honor.
>
> THE COURT:  Okay.  So it isn't just my reading of the agreement, I have to give deference to the arbitrator to that extent?
>
> MR. GANZ:  That's correct.  It was for the arbitrator in the first instance, certainly, and you to review that. . . .

Transcript of Oral Argument, November 27, 2001, at pp. 17-18.

[9]Article VIII provides in relevant part in Section A, Tenure:

11

the other hand maintained that the dispute fell within the broad scope of the general arbitration provision contained in Article XV of the CBA.[10]

Following his review of the text of Articles VIII and XV, the Arbitrator denied the Leagues' motion to dismiss, ruling instead that, although the first paragraph of Article VIII A vested substantial authority in the League presidents regarding the *termination* of umpires, the second paragraph placed two specific limitations on that authority. First, this "substantial authority" was "limited to issues concerning the 'merit and skill of the umpire to perform to Major League standards'," and, second, it had to be exercised without "discrimination or

---

[1]  In the event an umpire with five or more years of service is discharged by a League President, the umpire and the representative of the Association shall be entitled to an explanation of the reasons for his discharge and the umpire shall be entitled at his request to hearing before the League President at which time the discharge shall be subject to full review and re-examination by the League president. The decision of the League President after such hearing shall be final and binding.

[2]  All umpires shall be selected or retained in the discretion of the League Presidents on the basis of merit and the skill of the umpire to perform to Major League standards.  With respect to all such members of the regular staff, there shall be no discrimination or recrimination on the part of any party to this Agreement.

(paragraph numbering added).

[10]Article XV provides, in relevant part:

In the event of a dispute concerning a claimed violation of the provisions of this Agreement by either party thereto the matter shall be referred to the League President involved and a representative of the Association; and if an agreement is not reached by these two individuals within ten days the matter shall be referred to an arbitrator mutually agreed upon as sole neutral arbitrator to finally determine the matter.

12

recrimination." In view of this determination, the Arbitrator concluded that, "to the extent that the Presidents terminated or accepted the resignations of the 22 umpire grievants, as the case may be, the issue of whether this decision was an abuse of discretion or was performed in a discriminatory or recriminatory manner, is subject to arbitration." Rulings Concerning Employer's Motion to Dismiss *et al.* (Rulings) at 3. In confirming the Arbitrator's decision, the District Court held that, "because the parties contracted to arbitrate disputes concerning any 'claimed violation' of the Agreement, and because the current dispute concerning the selection or retention of umpires is such a 'claimed violation,' the arbitrator properly exercised jurisdiction." Major League Umpires Ass'n v. American League of Professional Baseball Clubs, No. 01-2790, slip op. at 12 (E.D.Pa . Dec. 13, 2001).

On appeal, the Leagues contend that the issue sought to be arbitrated by the MLUA was whether the Leagues violated the CBA by "terminating" the twenty-two umpires in question. They further assert that the CBA does not provide for arbitration of this issue, and that it therefore is not arbitrable. Instead, they argue that, in order to be arbitrable, a dispute must "concern[] a claimed violation of the provisions of th[e] [CBA]." (quoting Article XV of the CBA). The Leagues urged that Articles VIII and XV contain two mutually exclusive dispute resolution mechanisms; because the MLUA relied primarily upon Article VIII and the dispute resolution provision of Article VIII makes no mention of arbitration or of Article XV, the Arbitrator should have concluded that there was no agreement to arbitrate the dispute at issue here.

We have reviewed the applicable provisions of the CBA in light of the arguments of the parties and see no basis for vacating the Arbitrator's finding of arbitrability. Although we may question the clarity of the Arbitrator's ruling with respect to this issue, we do not conclude from the record before us that the Arbitrator considered the issue before him to be a simple Article VIII *termination* of the umpires. Rather, in rejecting the Leagues' motion to dismiss, the Arbitrator found the arbitrable issue to be one involving a determination of relative *"merit and skill"* and as well as the *possible abuse of discretion or exercise of discriminatory or recriminatory animus* in the respective League Presidents' decisions regarding the "terminat[ion] or accept[ance] [of] the resignations of the 22 umpire grievants." Rulings at 3. The reference by the Arbitrator to "merit and skill" and to "discriminatory or recriminatory animus" brings us down to the *second* paragraph of Section A of Article VIII. It is, however, the *first* paragraph of the Section A that speaks of "final and binding" review by the League President of umpire *discharges*.

From the foregoing, we conclude that the Arbitrator's initial finding of arbitrability was premised on alleged violations of the CBA, involving selection

13

of umpire candidates which selection did not involve merit and skill, and further premised on the Arbitrator's determination that he must consider whether there had been discriminatory or recriminatory animus. He determined that such types of violations did not fall under the limited review provision of the *first* paragraph of Article VIII A. By default, then they would fall within the broad scope of the general dispute resolution mechanism contained in Article XV. Thus, the Arbitrator's finding of arbitrability was not conditioned upon a finding that the reasons for the terminations required explanation prior to the exercise of the final and binding review of the League Presidents, as provided for in the first paragraph of Article VIII A. The review required from the nature of the alleged violations would encompass more than the "explanation of the reasons for . . . discharge" set out there and would therefore expand beyond the bounds of the "final and binding" authority of the League Presidents provided for in that *first* paragraph. In sum, we conclude that the Arbitrator did not ignore the plain language of the CBA, see National Ass'n of Letter Carriers, 272 F.3d at 186, or demonstrate manifest disregard for the CBA, see Newark Morning Ledger Co., 797 F.2d at 165, when he determined that violations of the provisions of the *second* paragraph of Article VIII A were covered by the arbitrability provisions of Article XV rather than by the specific review of discharges provided for in the preceding *first* paragraph of Article VIII A.

This conclusion is reinforced by the consideration of the arbitrability issue in the Arbitrator's Award. The Arbitrator quoted Article XV, the CBA's general dispute resolution provision, for the proposition that "[t]he dispute resolution language of the agreement gives me the jurisdiction to resolve disputes concerning 'claimed violations of the provisions of this agreement,'"and then noted that, "[w]hile there may be conflicting views concerning the propriety of the actions taken by both sides in this case, the sole question in this case concerns whether the actions taken were appropriate under the terms of the collective bargaining agreement." Opinion and Award at 71. In this reference to the "terms" of the CBA, the conclusion is evident that the Arbitrator is considering not just the League Presidents' discharge review authority of the first paragraph of Article VIII A but also the "no discrimination or recrimination" language of the second paragraph. From this it follows that the Arbitrator rationally determined that his consideration of whether there had been a violation of the CBA extended beyond a review of the reasons for discharge of an umpire by the League President as set out in the first paragraph of Article VIII A.

We find further reinforcement of this conclusion in the fact that the Arbitrator, in his Award, determined that the grievant umpires had *resigned* their positions, rather than having been *terminated*. For this reason, the Arbitrator concluded that the "limitations" for terminated umpires found in Article VIII A did not apply. We presume that in

referring to the "limitations" for terminated umpires of Article VIII A and their inapplicability to the case before him, the Arbitrator had in mind Article VIII A's "final and binding" review of umpire discharges by League Presidents, found in the *first* paragraph.

As noted above, an arbitrator's finding of arbitrability draws its essence from the CBA if it can be rationally "derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." United Transportation Union Local 1589, 51 F.3d at 379-80 (internal quotations omitted). Here, the Arbitrator's denial of the Leagues' motion to dismiss was based on a determination that the question whether there had been an abuse of discretion and discrimination and retaliation was not constrained by the limitations of the first paragraph of Article VIII A. We conclude that such a determination can rationally be derived from the CBA.

Whether, if faced with the initial determination, we would have come to the same decision is immaterial. There is no basis from which to conclude that the Arbitrator's finding of arbitrability fails to draw its essence from the CBA, as it may logically be derived from the text of that agreement. See Matteson, 99 F.3d at 113. Thus, we will affirm the District Court's confirmation of the Award with respect to arbitrability.

## C. Detrimental Reliance

Turning then to the merits of the underlying dispute, we begin with the Arbitrator's conclusion that the actions of the umpires amounted to actual resignations, as opposed to a mere threat or notification of future resignations, so that the Leagues acted properly in hiring replacements. The MLUA challenges this determination, contending that this ruling amounted to manifest disregard of the law, was not supported by the record, and failed to draw its essence from the CBA. The MLUA urges that, because no umpire actually relinquished his position prior to September 2, no umpire can be said to have "resigned." Thus, because the umpires did not resign, the Leagues' refusal to accept the umpires' rescissions of their resignations amounted to a discharge in violation of the CBA. The MLUA further claims that there is no evidence in the record to support the Leagues' claims of detrimental reliance.

In response, the Leagues justify their decision to begin hiring replacement umpires for the following reasons: (1) the inclusion of the phrase "I hereby resign my employment" in each of the resignation letters at issue; (2) the demand for "voluntary termination pay" by each umpire with more than ten years' service; (3) MLUA General Counsel Richard Phillips' statements to the media, which unequivocally indicated that the MLUA members had resigned and would not

15

rescind their resignations;[11] (4) the execution by each resigning umpire of an employment contract with Professional Umpire Services, Inc.; and (5) the filing by the MLUA of an action in the Eastern District of Pennsylvania seeking to establish the Leagues' obligation to make the severance payments required by the CBA in the event of voluntary termination. The Leagues assert that on this record the Arbitrator properly determined that the Leagues were justified in hiring replacement umpires.

We have reviewed the record below and find no basis for disturbing the award with respect to this issue. Under the standards of review of arbitration decisions set out above in Part IV A, the Arbitrator's conclusion that the umpires resigned and that the Leagues were justified in hiring replacement umpires is well supported by the facts of record and for that reason there is no basis for reversing it. See Tanoma Mining Co., 896 F.2d at 748. Simply put, the Arbitrator considered the MLUA's arguments and, based on the facts and his interpretation of the CBA and applicable law, found that the letters constituted resignations rather than notices of intent to resign. He therefore concluded that the Leagues acted appropriately by hiring replacements in reliance upon these representations.

The District Court found that this conclusion "was not a manifest error of law." Slip op. at 13. We agree. As noted above, because "the parties have bargained for the arbitrator's decision, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." Tanoma Mining Co., 896 F.2d at 747 (internal quotation omitted). Thus, we will affirm the District Court's confirmation of the Award with respect to this issue.

---

[11]The following exchange between Phillips and an interviewer from the television sports channel "ESPN" provides an example of such statements:

Phillips:    There's not a threat to resign. They have resigned; they have formally resigned their positions. It's not a threat. And they have all signed contracts with a professional services corporation. And, the first thing that they will do is they will receive the in excess of $15 million in severance that baseball owes them.

Interviewer:  Can the resignations be rescinded, and - - -

Phillips:    No.

Interviewer:  Can there be peace between the umpires and major league baseball achieved over the next couple of weeks in some kind of negotiation?

Phillips:    No.

### D. The Arbitrator's Application of Article VIII's "Merit and Skill" Criteria

The MLUA next challenges the Arbitrator's determination concerning the standards that National League President Coleman was required to apply in making his staffing decisions following the rescission of the remaining resignations on July 27. Specifically, in accordance with the MLUA's position that the letters constituted notices of intent to resign rather than actual resignations, the MLUA contends that the combination of new hires and resignation rescissions resulted in a situation in which the National League was overstaffed and National League President Coleman, in determining whom to retain, should have compared the "merit and skill" of the rescinding umpires not only as between those umpires but also as to the "merit and skill" of the new hires and that of those umpires who had never resigned. The MLUA urges that the Arbitrator's countenance of Coleman's failure to do so results in a decision which fails to draw its essence from the CBA.

In support of this argument, the MLUA analogizes the present situation to the one that existed in 1979 when its members refused to execute their individual employment contracts at the beginning of the baseball season despite the existence of a no-strike clause. There, the striking umpires were permitted to return to work once the situation was resolved. This resulted in overstaffing, as replacement umpires had been hired in the meantime. The MLUA claims that the current "merit and skill" language was inserted into the CBA as a result of the 1979 incident for the express purpose of preventing the Leagues from trimming the umpire ranks by taking action against those who participate in work stoppages.

In light of the history of the merit and skill provision, and because National League President Coleman admitted during his testimony before the Arbitrator that he never applied the merit and skill criteria to either those umpires who never resigned or those newly hired, the MLUA argues that his actions violated the plain language of the CBA. Further, because American League President Budig never applied the merit and skill criteria in the first instance, the Association asserts that he too violated the CBA and that the Award, which the MLUA contends effectively allows each League to employ a different decision-making process, fails to draw its essence from the CBA.

We again reject the MLUA's arguments. As a preliminary matter, in view of the unequivocal no-strike clause contained in the CBA, we find troubling the assertion that the merit and skill criteria was inserted in order to protect striking umpires. Indeed, if we were to read Article XIX of the CBA as prohibiting strikes while Article VIII nevertheless protects striking umpires, we would have a very tortured interpretation of the contract.

Moreover, even if there were some arguable merit to the MLUA's attempt to

17

analogize this situation to the job action taken by its members in 1979, the Arbitrator rejected its argument with respect to this issue. See Opinion and Award at 88-89. Instead, he found that, unlike the situation that existed in 1979, the 1999 work stoppage at issue here involved: (1) the actual severing of the employment relationship through resignation; (2) the hiring of permanent replacements; and (3) no decision by the League presidents to increase the size of their respective umpire staffs. Id. This conclusion does not constitute a manifest disregard for either the CBA or the applicable law. See Neward Morning Ledger, Co., 797 F.2d at 165. Thus, we see no basis for disturbing the District Court's confirmation of this aspect of the Award.

### E. The Arbitrator's Resolution of the Claims of Individual Umpires

As discussed above, by the time the remaining thirty-two National League umpires attempted to rescind their resignations on July 27, National League President Coleman, through new hires and prior resignation rescissions, had already filled nineteen of the thirty-two vacant positions. Because of the limited vacancies, he had to accept the resignations of thirteen of the National League umpires. He chose to accept the resignations of the following umpires: Darling, Hohn, Poncino, Pulli, West, Tata, Vanover, Davidson, Gregg, Hallion, Nauert, Dreckman, and Holbrook, all of whom filed grievances. In his Award, the

Arbitrator sustained some of the grievances and denied others. He ordered the reinstatement of National League Umpires Darling, Hohn, Poncino, Pulli, Tata, West, and Vanover (the Darling Group), but denied the grievances and upheld Coleman's acceptance of the resignations of Umpires Davidson, Gregg, and Hallion, (the Davidson Group), as well as Umpires Nauert, Dreckman, and Holbrook (the Nauert Group). The Leagues now contend that the District Court erred in confirming the Arbitrator's construction and application of Article VIII in making these determinations.

Because Coleman elected not to exercise his discretion to increase the size of the National League staff, he was forced to find a method to determine which nineteen umpires would be permitted to rescind their resignations and which thirteen would have their resignations accepted. In so doing, he sought input from the MLUA's counsel, who simply insisted that all decisions be made on the basis of seniority, which would have guaranteed that all resigning MLUA members would be rehired and the new replacement umpires released. Coleman rejected this suggestion.

Without any other guidance for making such determinations, Coleman decided to use the merit and skill criteria from Article VIII A of the CBA to select

18

which resignation rescissions to accept.[12]

As stated above, in applying this merit and skill provision to the thirty-two National League umpires who attempted to rescind their resignations on July 27, Coleman accepted only nineteen rescissions. The thirteen National League umpires not permitted to rescind fell into either the Darling, Davidson, or Nauert Groups.

With respect to the Darling and Nauert Groups, Coleman refused to allow them to rescind their resignations because of the limited number of unfilled positions. However, in refusing to allow the Davidson Group to rescind their resignations, Coleman articulated various reasons why he believed each member of the group lacked the merit and skill necessary to perform to Major League standards.

After reviewing Coleman's decisions to refuse reinstatement, the Arbitrator upheld him on the Davidson and Nauert groups but reversed Coleman's refusal to rescind the Darling Group's resignations. The primary basis for the ruling on the Darling Group was the Arbitrator's belief that Coleman's decision to reject their rescissions was based solely on the number of available positions, not on merit or skill, and that this ran afoul of the terms of Article VIII. Although the Arbitrator concluded that the League President had substantial discretion in employment decisions regarding the tenure of umpires, he found that Article VIII limited this discretion by requiring the League President's decision to be based on the "merit and skill" to perform to Major League standards. The Arbitrator therefore concluded that the discretion exercised by the League presidents "is not limitless," and that such decisions "must be one[s] that can be reasonably articulated and related to issues of merit and skill and not arbitrary or capricious." Opinion and Award at 90. The Arbitrator therefore concluded:

> In reviewing these explanations in light of the broad discretion given to League Presidents, it is this Arbitrator's view that Mr. Coleman must articulate an explanation that has some relationship to the merit and skill of that Umpire as well as the other factors that he considered. If Mr. Coleman was unable to articulate a basis, then I must conclude that he abused his discretion. The mere statement that he had to find the "numbers" required to

___

[12] The relevant language in Article VIII A, paragraph 2, is "[a]ll umpires shall be selected or retained in the discretion of the League Presidents on the basis of merit and the skill of the umpire to perform to Major League standards." See footnote 9 for the full text of Article VIII A.

fill the positions is an arbitrary consideration and must be overruled.

Id. (footnote omitted).

However, the Arbitrator upheld Coleman's decision to refuse to allow the Davidson Group to rescind because Coleman articulated a merit- or skill-related basis for the refusal. Finally, the Arbitrator concluded that the members of the Nauert Group did not have more than five years experience and thus were not entitled to the limited protections offered by Article VIII. Opinion and Award at 93-94.

The Leagues challenge the Arbitrator's interpretation and application of Article VIII. Specifically, the Leagues contend that the Arbitrator exceeded his authority and that the Award failed to draw its essence from the CBA in two respects. First, they read the Award as concluding that Article VIII is applicable only in situations involving the selection or retention of umpires. They also read the Award as holding that the umpires at issue in this case voluntarily resigned and were not entitled to the protections afforded by Article VIII. The Leagues therefore contend that the Arbitrator's application of the Article VIII merit and skill criteria results in a logical inconsistency.

Second, the Leagues assert that the arbitrary and capricious standard of review applied by the Arbitrator to Coleman's merit and skill determinations exceeded

his authority and failed to draw its essence from the CBA. Simply stated, they allege the Arbitrator impermissibly created his own standard of review for merit and skill determinations out of whole cloth. In response, the MLUA contends that a reviewing court should look only to the Arbitrator's Award, and not his reasoning, in determining whether it draws its essence from the CBA.

In reviewing this portion of the Award, the District Court noted its concern over the Arbitrator's determination with respect to this issue. The court nevertheless, citing Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960), and ARCO-Polymers, Inc. v. Local 8-74, 671 F.2d 752, 756 (3d Cir. 1982), confirmed this portion of the Award because the court believed binding precedent prevented it from vacating an award simply because of the existence of ambiguity in the Arbitrator's reasoning. Although the court noted the confusing nature of the Award, it ultimately concluded that the Arbitrator "did interpret the Agreement and did manifest fidelity to his proper role as to the National League umpires to whom he applied the merit and skill standard of Article VIII A. Slip op. at 17. The District Court further noted that, because it believed the Arbitrator had reached the proper conclusion, the reasoning which provided the basis for its conclusion was irrelevant.

We are in accord with the District Court's conclusion that it may not vacate an award based solely on an ambiguity in

20

an arbitrator's opinion. See Roadway Package System, Inc. v. Kayser, 257 F.3d 287, 301 (3d Cir. 2001). However, we agree with the Leagues' assertion that the District Court erred in stating that the reasoning of the Arbitrator is entirely irrelevant. See id. (holding that "a court may conclude that an arbitrator exceeded his or her authority when it is obvious from the written opinion"); Newark Morning Ledger, 797 F.2d at 167 n.6 (holding that a court is not required "to disregard what an arbitrator says in order to justify what the arbitrator does"). Nevertheless, we do not find this error to be essential to the court's resolution of this matter. We therefore reject the Leagues' invitation to use it as a basis for disturbing the District Court's confirmation of this portion of the Award. At bottom, the Leagues' primary contention is that the Award is inconsistent. More specifically, they contend the Arbitrator employed varying and questionable logic in first determining that Article VIII did not govern the dispute because the umpires had resigned (as opposed to being terminated), but then nevertheless requiring National League President Coleman to employ the Article VIII skill and merit criteria appropriately and consistently once he chose to invoke it.

The Leagues' argument is unpersuasive. Regardless of whether another interpretation of the CBA would make more sense, or whether we or the District Court would reach a different result if reviewing this case de novo, the Arbitrator's reading is logical and clearly

draws its essence from the CBA.

Simply stated, the Arbitrator's interpretation of the CBA was as follows: (1) Article VIII creates minimal protections from termination for umpires with more than five years of service; (2) because the umpires at issue in this case resigned, none were entitled to the protections of Article VIII in the first instance regardless of the number of years of service; (3) even though Article VIII was not directly applicable in this case, National League President Coleman invoked it in determining which nineteen of the thirty-two final resignation rescissions to accept (a decision that essentially involved the "selection" of individuals from among the pool of resigned umpires, thereby arguably making the application of Article VIII appropriate); (4) once Article VIII was invoked, Coleman was required to adhere to its terms in making his determinations with respect to which rescissions to accept; (5) adhering to Article VIII meant articulating a reason that bore "some relationship to the merit and skill of th[e] umpire," for each decision reached with respect to the thirteen umpires not permitted to rescind their letters of resignation; (6) because Coleman failed to meet this standard with respect to the Darling Group, those umpires must be reinstated; (7) because Coleman did meet this standard with respect to the Davidson Group, the grievances of those umpires were denied; (8) however, because the Nauert Group failed to qualify for this protection in the first place, the members

of that group could essentially be fired at will.

Although we acknowledge that the quality of the Arbitrator's reasoning leaves something to be desired, we see no basis for judicial intervention. The Arbitrator's interpretation is discernable, coherent, and draws its essence from the CBA. Given the limited scope of our review, nothing more is required.

In closing, we cannot help but note that, at their core, many of the claims raised by both sides in this litigation amount to little more than requests for judicial review of the merits of the Award. We reiterate that such review is inimical to the public policy underlying the limited role assigned to the federal courts in the area of arbitration. See Pennsylvania Power II, 276 F.3d at 178 ("The rationale for the court's limited role is to ensure that the federal policy of encouraging arbitration of labor disputes is not subverted by excessive court intervention on the merits of an award."); Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir. 1994) ("Limited judicial review is necessary to encourage the use of arbitration as an alternative to formal litigation . . . . A policy favoring arbitration would mean little, of course, if arbitration were merely the prologue to prolonged litigation.").

It is beyond question that arbitration proceedings are a valuable method of dispute resolution, as they offer a means by which parties may obtain a binding result within a short period of time and at relatively minimal expense. See, e.g., Matteson, 99 F.3d at 113 (noting "the congressional policy of promoting speedy, efficient, and inexpensive resolution of labor grievances"); Remmey, 32 F.3d at 146 (noting that "the 'twin goals of arbitration'" are "'settling disputes efficiently and avoiding long and expensive litigation'") (quoting Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993)). However, the possibility of receiving inconsistent or incorrect rulings without meaningful appellate review of the merits is one of the risks such parties must accept when they choose arbitration over litigation. Where, as here, an award that is questionable nevertheless falls within the broad discretion granted to arbitrators, it must be confirmed.

## V. Conclusion

For the reasons stated above, we will affirm the final judgment of the District Court.

Becker, *Circuit Judge*, dissenting.

In my view, the dispute that the Arbitrator, the District Court, and the majority of this panel go to such lengths to resolve was never arbitrable in the first place. These tribunals are all agreed that the umpires resigned – a mass resignation of a significant portion of the bargaining unit. None of the umpires was terminated or discharged. As I see it, under these circumstances, there was no violation

either of the basic agreement or of the first paragraph of Article VIII A that could trigger the arbitration clause. Moreover, even if one were to ignore the fact of the resignations, the matter would still not be arbitrable because as I read that clause, it confers upon the League Presidents the unfettered ("final and binding") right to discharge an umpire with five or more years of service.[13] The language could not be clearer, and the exercise of conflating the second paragraph of Article VIII A – which deals with retention on the basis of merit or skill, and the proscription against discrimination or recrimination – with the first paragraph of Article VIII A does not carry the day because the first paragraph deals with a wholly different situation – a mass resignation.

This result is not changed by the standard of review. As I read the record, Major League Baseball agreed to submit the question of arbitrability to the arbitrator while preserving its right to challenge his determination. While this converts our normal *de novo* standard of review (of the arbitrability decision) into a deferential one, *see United Indus. Workers v. Gov't of V.I.*, 987 F.2d 162, 167-68 (3d Cir. 1993), that does not change the result because, in my opinion, the determination that the dispute was arbitrable was manifestly erroneous, and did not draw its essence from the agreement. I therefore respectfully dissent, and would vacate the judgment of the District Court and remand with directions to dismiss the complaint.

---

[1.] Any argument based on the five year clause has dropped out of the case because the umpires with less than five years experience have settled.