

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-2007

# Five Star Parking v. Local 723

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2012

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Five Star Parking v. Local 723" (2007). *2007 Decisions.* Paper 705.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/705

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-2012
_____

FIVE STAR PARKING

v.

UNION LOCAL 723, affiliated with the INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,

Appellant.

_____

On Appeal From the United States District Court
for the District of New Jersey
(No. 05-cv-03975)
District Judge:  Honorable William J. Martini

Argued March 28, 2007

Before: RENDELL, BARRY and CHAGARES, *Circuit Judges*.

(Filed:  July 24, 2007 )
_____

OPINION OF THE COURT
_____

Raymond G. Heineman, Esq., Argued
Kroll Heineman Giblin
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey 08830
Attorney for Appellant

Michael S. Cryan, Esq., Argued
Arent Fox PLLC
1675 Broadway
New York, NY 10019
Attorney for Appellee

CHAGARES, *Circuit Judge*.

Appellant International Brotherhood of Teamsters Union Local 723 (the "Union")

appeals from an Order of the United States District Court for the District of New Jersey

entered on December 21, 2005 which vacated an arbitration award favorable to the

Union. For the reasons expressed below, we will reverse the District Court and remand

with instructions to confirm the award.

I.

Appellee Five Star Parking ("Five Star") manages and operates parking lots at

Newark Liberty International Airport. The Union represents employees at Five Star's

Newark Airport parking facilities. Five Star and the Union are parties to a collective

bargaining agreement ("CBA"). The CBA provides that unresolved grievances may be

submitted to arbitration for final, binding resolution. Article 4 Section 1 of the CBA

defines the scope of arbitration as including: "Any controversy, claim, dispute or

grievance arising between the Company and the Union or any Employee, involving or concerning the meaning, interpretation, operation, or application of any clause of this Agreement, or by a breach or threatened breach of this Agreement." A101. An arbitrator's power to resolve grievances, found at Article 4(i), is

> limited to the particular dispute in question and [the arbitrator] shall be bound and governed by the provisions of this contract and restricted to its application to the facts presented to him . . . . The arbitrator shall not have jurisdiction or authority to add to, modify, detract from, or alter in any way the provisions of this Agreement or any amendment or any supplement thereto.

A102. In other words, an arbitrator is limited to resolving disputes over "rights" in the CBA and shall not engage in what is known as "interest" arbitration – the creation of new rights not previously contemplated by the parties.

The CBA does not include procedures to resolve an "impasse." Impasse is not mentioned in the CBA.

Five Star and the Union negotiated specific wages for cashiers, traffic attendants, valet attendants and lot checkers. These wage rates are reflected in Schedule A of the CBA and were in effect from August 1, 2002 to July 31, 2003. After the first year, the CBA provided for 3% wage increases across the board to commence on August 1, 2003 and continue until July 31, 2004. Thereafter, the CBA was silent as to wage increases; presumably wages were to remain static unless further wage negotiation took place. To this end, the CBA contained a "re-opener" provision which permitted the parties to re-negotiate wages as of August 1, 2004 and again as of August 1, 2006 with 60 days notice

3

to the other party. The Union agreed that "during such periods of re-opener, the no-strike, no lockout provisions of this Agreement shall remain in full force and effect." A117.

On June 18, 2004, the Union invoked the re-opener provision. The Union sought a $1.00 per hour wage increase in each succeeding year of the CBA – 2004 to 2008. The parties met briefly on July 20, 2004 for their first negotiation session. At the July 20 meeting, which lasted about one hour, Five Star indicated that its labor costs were exceeding the budget provided to the Port Authority of New York and New Jersey ("Port Authority") and that the Port Authority was going to request new bids for the management of the Newark facilities. Five Star sought a 12.5% reduction in labor costs.

The parties met again on August 3, 2004 for approximately one hour. The Union indicated it was not interested in negotiating a regressive contract and sought financial data from Five Star as proof that it was operating over budget. On August 9, 2004, counsel for Five Star responded by sending the Union a letter summarizing Five Star's financial condition, but without supporting financial data. In the letter, Five Star stated that it "wants to avoid any unilateral action consequent to a good faith impasse in negotiations." A123.

The Union replied by letter dated August 13, 2004, in which it reiterated that it would not "bargain against itself." A128. Addressing Five Star's contention that the Port Authority might replace Five Star as manager of the Newark Airport parking facilities, the Union stated, "[i]n several months, it is possible that Five Star Parking will not be at this facility. Thus, it is hard, as indicated at the meeting, for Local 723 to negotiate

4

concessions to the collective bargaining agreement for a Company that may no longer be at this facility and then be left with those concessions for the new vendor coming in." Id. The Union further stated that Five Star was obligated to bargain in good faith and to date, no bargaining had occurred – only Five Star's unilateral demand that labor costs be reduced by 12.5%. Finally, the Union made a second request for financial information covering the period from July 2002 to August 2004. Ultimately, it appears that financial information pertaining to the Newark facility was made available to the Union, but not financial information concerning Five Star's other operations.

On August 27, 2004, in writing, Five Star reiterated its proposal for wage reductions and indicated that "[i]f the Union continues to insist upon conditioning negotiations upon receiving financial information that it is not by law entitled to, and declines to resume negotiations on September 3, 2004, a date offered by the Union, the Company will deem the parties to be at an impasse. Accordingly, it will be free to implement unilaterally its pending and oft repeated proposal to reduce rates of pay." A29.

On September 1, 2004, the Union wrote to Five Star indicating that it was withdrawing its request for re-opener and would file an unfair labor practice charge with the National Labor Relations Board ("NLRB") and file for arbitration if Five Star unilaterally implemented a wage reduction.

On September 2, 2004, Five Star declared an impasse. On September 14, 2004, the Union filed an unfair labor practice charge with the NLRB alleging that Five Star violated section 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"). Prior to a

5

ruling by the NLRB, however, the Union voluntarily withdrew its charge.

On September 17, 2004, Five Star implemented a 12.5% wage reduction for all employees. On September 21, 2004, the Union filed a grievance contesting Five Star's unilateral implementation of the wage decrease as a violation of Article 20 and Schedule A of the CBA. The grievance stated, "On September 17, 2004, Five Star Parking unilaterally, without negotiations, without 'impasse' in negotiations, implemented a [12.5%] wage reduction." A137. The case proceeded to arbitration.

At the arbitration hearing, the parties stipulated to the issue to be decided: "Did the Employer violate Article 20 and Schedule A[1] of the Agreement when on September 17, 2004, Five Star Parking implemented a wage reduction?" A23. Five Star argued that the arbitrator lacked jurisdiction over the dispute because resolution required a determination of whether an impasse occurred. According to Five Star, determining

---

[1]Article 20 states, in pertinent part: "Section 1: The rates of pay shall be in accordance with [Schedule] A annexed hereto and made a part hereof." A112.

Schedule A list rates of pay for the different job classifications. A118.

Section 2(a) of Schedule A is entitled "Future Pay Increases" and states: "For the period commencing August 1, 2003 and continuing until July 31, 2004, all employees shall receive an across-the-board increase in their respective personal hourly rates of pay equal to three percent (3%). It is agreed, however, that the actual effective date shall be the first day of the first pay period falling on or after August 1, 2003." Id.

Section 2(b) states: "In accordance with the provision of Article 12 of this Agreement, this Agreement may be reopened by either party as of August 1, 2004 and August 1, 2006, but solely for the purpose of negotiating concerning rates of pay and other monetary benefits, but for no other purposes, without exception." Id.

6

whether an impasse occurred requires interpretation of the NLRA, something only the NLRB can do.

The arbitrator sustained the grievance by an Opinion and Award dated August 3, 2005. The arbitrator concluded that "[b]ased on the facts in evidence, there is no question that the Employer's action of September 17, 2004, in reducing the employer's [sic] wages was violative of the collective bargaining agreement." A55. Later in the opinion, the arbitrator reiterated that "[t]he Employer's unilateral action of reducing the wages of bargaining unit members was in violation of the Agreement." A58. Five Star was ordered to pay back pay to all employees whose wages were reduced.

In dealing with Five Star's jurisdiction argument, the arbitrator identified the "gravemen [sic] of the Union's argument [as being] that the Employer unilaterally implemented a 12.5% wage reduction. All other issues of a statutory nature are not before me. . . . My only determination will be whether or not the contract was violated." A52-A53. However, the arbitrator commented, "I find it extremely difficult to accept the Employer's argument that an impasse existed after approximately two, maybe three, hours of bargaining," and "[b]ased upon all of the evidence and voluminous documentation presented by both parties, I am not convinced that an impasse existed." A54. Finally, the arbitrator explained,

> When an employer proposes a wage reduction that is agreed to by a
> Union that is a concession. Concessionary bargaining produces
> some interesting results. However, in the instant matter, the
> Employer never allowed the negotiations process to really move
> forward or to pick up steam to see where they could reach some type

7

of common ground. They simply said, we will not give you the additional financial information you are asking for, and if you do not show up for the September 3, 2004 negotiating session we are declaring an impasse. Accordingly, they declared an impasse and reduced the wages of the employees.

. . . .

What is before me is that the Employer's action breached the Agreement. I have already determined that it did.

It breached the Agreement because there was no impasse. . . . I can't accept the limited time spent in bargaining as a basis for the Employer's authority to reduce the wages of the bargaining unit members.

A56-A57.

Five Star moved to vacate the arbitration award before the District Court. The Union cross-moved for summary judgment to confirm the award. The District Court vacated the arbitration award, concluding that "the arbitrator exceeded his jurisdiction in granting the arbitral award. An arbitrator's role is to interpret the terms of the CBA rather than to decide issues of unfair labor practices. The latter is governed by the NLRA and under the jurisdiction of the NLRB." A6 (citation omitted). Here, according to the District Court, the arbitrator failed to ground the decision in any provision of the CBA. Instead, the arbitrator decided that the parties had not reached an impasse and therefore Five Star violated the CBA by instituting a wage reduction. The District Court held that the arbitrator's decision rested improperly and exclusively on its interpretation of the concept of "impasse." The Union appealed.

II.

8

The District Court exercised jurisdiction pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and 28 U.S.C. § 1331. The final order of the District Court vacating the arbitration award disposed of all the Union's claims. Our jurisdiction is premised upon 28 U.S.C. § 1291.

We exercise plenary review over the District Court's ruling. Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs, 357 F.3d 272, 279 (3d Cir. 2004). Arbitration awards enjoy a strong presumption of correctness. We will uphold an arbitration award that "draws its essence from the collective bargaining agreement." Id. at 280 (citations omitted). Although an arbitrator's interpretation of a collective bargaining agreement is accorded substantial deference, it may be vacated if the arbitrator demonstrates manifest disregard for the collective bargaining agreement. Id. "Manifest disregard for the CBA is established when the arbitrator's award is totally unsupported by principles of contract construction." Id. (internal quotations and citations omitted). As long as an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000) (quoting United Paperworks Int'l Union AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987)). Here, it is clear that the arbitrator acted within the scope of his authority and committed no error in construing and applying the CBA. Consequently, we will uphold his decision.

III.

9

The District Court vacated the arbitration award based on its perception that the arbitrator lacked jurisdiction to decide the issue of whether impasse existed and also because it concluded that the arbitrator "failed to ground his decision in any provision of the CBA." A7. The District Court rightly recognized that "[w]hile it is true that, for purposes of efficiency and economy, an arbitrator may at times hear issues pertaining to unfair labor practices, this is only permissible when the arbitrator decides NLRA issues in addition to issues of contract interpretation." Id. (citing Carey v. Westinghouse Electric Corp., 375 U.S. 261, 271 (1964)). There was clearly an unfair labor practice issue here dealing with the concept of impasse and whether the parties bargained in good faith. Because the District Court seemingly understood that the issue of impasse could have been decided by an arbitrator if there were also issues of contractual interpretation in dispute, the outcome of this appeal depends on whether there was an arbitrable contractual issue at stake rather than merely on whether the arbitrator could or could not decide the issue of impasse.

By stipulating to the issue to be decided by the arbitrator, "Did the Employer violate Article 20 and Schedule A of the Agreement when on September 17, 2004, Five Star Parking implemented a wage reduction?," it is abundantly clear that Five Star agreed from the outset that the grievance was arbitrable and that it related to Article 20 and Schedule A of the CBA. The arbitration clause broadly provides for arbitration of "[a]ny controversy, claim, dispute or grievance arising between the Company and the Union or any Employee, involving or concerning the meaning, interpretation, operation or

10

application of any clause of this Agreement, or by a breach or threatened breach of this Agreement." The wage re-opener provision in Schedule A of the CBA expressly requires that the parties negotiate; a refusal or failure to negotiate therefore would be a breach of the CBA.

The fact that the parties did not provide for even cost-of-living adjustments to salaries after July 31, 2004, but instead provided for wage re-opener *negotiations* is compelling evidence that they considered negotiation to be the sine qua non of that contractual provision. Although declaring an impasse in bad faith implicates the NLRA, the statutory requirement to negotiate in good faith overlaps the parties' express contractual agreement to "negotiat[e] concerning rates of pay." It therefore fell upon the arbitrator to interpret the meaning of "negotiat[e] concerning rates of pay" in the wage re-negotiation context because this involved or concerned "the meaning, interpretation, operation or application of [a] clause of this Agreement, or . . . a breach or threatened breach of this Agreement." Thus, we conclude that there was a bona fide contractual dispute and the issue was properly before the arbitrator. See Carey, 375 U.S. at 271; see also Collyer Insulated Wire, 192 N.L.R.B. 837 (1971).

The arbitrator declared an intent to decide whether there was a breach of contract, and in so deciding, found that the parties failed to negotiate pursuant to the express terms of Schedule A of the CBA. The award merely returns the salaries to the status quo by ordering Five Star to pay back the amounts wrongly deducted therefrom. It does not set new salaries for the parties. The arbitrator did not engage improperly in interest

11

arbitration, see Pennsylvania Power Co. v. Electrical Workers, Local 272, 886 F.2d 46, 48-49 (3d Cir. 1989), but rather acted within the scope of his authority to construe and apply the CBA.

For the foregoing reasons, we conclude that the arbitration award draws its essence from the CBA and should not be disturbed. Accordingly, we will reverse the District Court's Order of December 20, 2005, and remand to the District Court with instructions to confirm the arbitration award in favor of the Union.